PER CURIAM.
 

 This case is before the Court on appeal from a judgment of conviction of first-degree murder and a sentence of death. We have jurisdiction.
 
 See
 
 art. V, § 3(b)(1), Fla. Const. We affirm.
 

 I. BACKGROUND
 

 On April 3, 2003, Mark Twilegar was charged with first-degree murder, either by premeditated design or in the course of a robbery, for the shooting death of David Thomas in Fort Myers on August 7, 2002. The evidence presented at trial showed that Twilegar came to Fort Myers from Missouri in the spring of 2002 and lived for a couple of weeks with his niece, Jennifer Morrison, who rented a residence from the victim, David Thomas, and his wife, Mary Ann Lehman. Twilegar’s mother arrived a few weeks later and also moved in with Morrison. After several weeks, Twilegar moved out and eventually pitched a three-
 
 *186
 
 room tent in an undeveloped area adjacent to the backyard of a house at 412 Miramar Road, which was occupied by Britany and Shane McArthur. Twilegar did not own a car and did not have a regular job. In lieu of paying rent, he worked as a handyman on the premises. His possessions included a couch, a TV, some clothes and a twelve-gauge shotgun, which he kept in the tent. The McArthurs moved out of the house in June 2002, and Britany’s younger brother, Spencer, moved into the house in September. Prior to moving in, Spencer stopped by the house on a regular basis to perform renovations, as discussed below.
 

 On occasion, Twilegar worked as a handyman for the victim, David Thomas, and on August 2, 2002, the two drove in Thomas’s pickup truck to Montgomery, Alabama, where Twilegar had agreed to install a deck on a house Thomas owned there. Thomas told his wife that he would be gone six to eight weeks. On the morning of August 6, 2002, Thomas withdrew $25,000 in cash from a bank in Montgomery, ostensibly to purchase a house at an auction, and then later that same morning he rented a Dodge Neon, arranging to return the car in Montgomery on August 9, 2002. Thomas called his girlfriend, Valerie Bisnett Fabina, in Fort Myers and told her that he and Twilegar would be returning to Fort Myers that night. Thomas’s neighbor last saw Thomas and Twilegar at the Montgomery house at approximately 3 p.m. that afternoon. Thomas and Twilegar then returned to Fort Myers, where Thomas met with Fabina at approximately 11 p.m. and obtained a motel room key card from her. At the meeting, Fabina observed Twilegar sitting in the passenger seat of the Neon.
 

 The next evening, August 7, 2002, Thomas visited Fabina at her job at 7 or 7:30 p.m. and returned the motel key card. When he opened his wallet to remove the key card, Fabina noticed that he had an unusually large amount of cash. Thomas told her that he and Twilegar were going to go look at a truck to buy for Twilegar to use on the job in Alabama, and that he would meet her later that night at the motel. Fabina never saw or heard from him again. Thomas spoke with his wife, Mary Ann Lehman, by phone a little after 9 p.m. that evening, and they made arrangements to speak again in the morning. She never saw or heard from him again. Later that night, Twilegar, alone, arrived at Jennifer Morrison’s house, where Twile-gar’s mother was staying. Morrison then drove Twilegar to 7-Eleven where he purchased cell-phones and supplies. She also drove him to Wal-Mart where he made additional purchases. When they arrived back at the house, Morrison went to bed. When she woke the next morning, Twile-gar and his mother and their possessions were gone. Morrison would never see Twilegar in Fort Myers again.
 

 After Britany and Shane moved out of the Miramar house in June but before Spencer moved into the house in September, Spencer arrived at the house one day at 4 p.m. to perform renovations and he saw Twilegar digging in the backyard on the far side of his tent. Spencer watched him briefly, unobserved, then returned to the front of the house. A few minutes later, Twilegar approached him and explained that a man would be stopping by to deliver a couple of pounds of “weed” and that the man would not stop if he saw Spencer there. Twilegar asked him to leave the premises and told him that if he did he would give him either $100 or an ounce of weed. Spencer left, and when he returned the next day, he found a $100 bill in the prearranged spot. He also found Twilegar’s tent disassembled and smoldering in the backyard incinerator. Most of Twilegar’s possessions were gone, including the shotgun. Spencer would never see
 
 *187
 
 Twilegar in Fort Myers again. On September 26, 2002, after Thomas’s disappearance was publicized, Spencer went to the spot where Twilegar had been digging and found that the area was covered by Twile-gar’s couch. He moved the couch aside and found an area of freshly dug dirt, covered with palm fronds. Beneath the palm fronds was a piece of plywood, and beneath that a couple of cinder blocks and a car ramp. After digging several feet, he detected a strong odor. Police were called and they discovered Thomas’s body.
 

 Thomas died from a single shotgun blast to his upper right back, delivered at close range. The 7 1/2 birdshot, from a twelve-gauge shell, had travelled through his body at a downward trajectory. He had died within minutes of being shot. Soft fine sand, similar to that which covered the exterior of his body, was found deep inside his throat, in his larynx, indicating that he had still been breathing, though not necessarily conscious, when buried. He was still wearing the same clothes he had been wearing when Fabina last saw him on August 7, 2002, but his wallet was missing. His body was badly decomposed, and the time of death was uncertain. A spent twelve-gauge shell was found in the incinerator, along with a broken D-shaped garden tool handle. Twilegar’s shotgun was never found. Several live twelve-gauge shells were found discarded in the area, along with a shovel with a broken handle. Thomas’s rental car key fob was found approximately 100 feet from the body. The rental car was found earlier, on August 13, 2002, burned in a remote area of Lee County. Twilegar was apprehended September 20, 2002, in Greenville, Tennessee, where he had been staying at a campground since August 21, 2002. Among the property seized at the campground were numerous retail receipts totaling thousands of dollars for camping supplies and other items purchased after Twilegar had left Fort Myers. The merchandise was all purchased with cash. While awaiting trial, Twilegar made several incriminating phone calls, which were recorded.
 

 Twilegar’s trial began January 16, 2007, and he testified in the guilt phase. He stated that the “weed” incident had in fact occurred but that it had happened before he left for Alabama with Thomas, not after he returned. He said that he had often dug holes near his tent for latrine purposes. He also testified that he had returned from Alabama not with Thomas on August 6, 2002, but alone on August 5, 2002, in a ear Thomas had given him as partial payment for the deck work he was doing, and that he had later sold the car to an itinerant in Palm Beach. He testified that during the early morning hours of August 8, 2002, after shopping at 7-Eleven and Wal-Mart, he had driven his mother’s car, which was already packed with their possessions, back to his tent to get his shaving kit and that someone had pointed a shotgun at him in the dark and that he had deflected the shot, injuring his hand. He kicked the assailant and ran away.
 

 After closing arguments, the jury deliberated for little more than an hour and on January 26, 2007, returned a verdict finding Twilegar guilty of first-degree premeditated murder. Twilegar waived a penalty phase jury and waived both the investigation and the presentation of mitigation. The penalty phase proceeding was held before the judge on February 16, 2007, and the State presented argument in aggravation, while the defense stood mute. The Spencer
 
 [1]
 
 hearing was held February
 
 *188
 
 19, 2007. On August 14, 2007, the court sentenced Twilegar to death, based on two aggravating circumstances,
 
 [2]
 
 no statutory mitigating circumstances, and four non-statutory mitigating circumstances.
 
 [3]
 
 This appeal follows, wherein Twilegar raises nine issues.
 
 [4]
 

 II. ISSUES ON APPEAL
 

 A.
 
 Sufficiency of the Evidence Showing That Twilegar Was the Killer
 

 Twilegar contends that the trial court erred in concluding that the evidence is sufficient to show that he killed Thomas. We disagree. When sufficiency of the evidence is in issue, several standards of review are applicable. The following standard applies where the evidence of guilt is direct, whether in whole or in part: if a rational trier of fact, upon reviewing the evidence in the light most favorable to the State, could find that the elements of the crime have been established beyond a reasonable doubt, then the evidence is sufficient to sustain the conviction.
 
 Pagan v. State,
 
 830 So.2d 792, 803 (Fla.2002). Where the evidence of guilt is wholly circumstantial, on the other hand, the following standard applies: not only must the evidence be sufficient to establish each element of the offense, but the evidence also must be inconsistent with any reasonable hypothesis of innocence proposed by the defendant.
 
 Id.
 
 The issue of inconsistency is a jury question and the verdict will be sustained if supported by competent, substantial evidence.
 
 State v. Law,
 
 559 So.2d 187, 188 (Fla.1989).
 

 The Court in
 
 Davis v. State,
 
 90 So.2d 629 (Fla.1956), addressed the issue of direct versus circumstantial evidence:
 

 In arriving at the conclusion which we hereafter announce, we are aware of the fact that circumstantial evidence is many times relied upon to support convictions for crimes. Direct evidence is that to which the witness testifies of his own knowledge as to the facts at issue.
 
 Circumstantial evidence is proof of certain
 
 
 *189
 

 facts and circumstances from which the trier of fact may infer that the ultimate facts in dispute existed or did not exist.
 
 The conclusion as to the ultimate facts must be one which in the common experiences of men may reasonably be made on the basis of the known facts and circumstances.
 

 Davis,
 
 90 So.2d at 631 (emphasis added). In the present case, the evidence of guilt is circumstantial.
 
 [5]
 

 Applying the above law to the present case, we conclude that Twilegar has failed to show that the trial court erred in concluding that the evidence is sufficient to prove that he committed the crime. First, viewing the evidence of guilt in the light most favorable to the State, a rational trier of fact could find that the elements of the crime have been established beyond a reasonable doubt. The evidence of guilt includes the following: (1) Twilegar returned from Alabama with Thomas on August 6, 2002, and was seen in his company late that night; (2) Twilegar was seen digging a hole near his tent at approximately 4 p.m. on what was probably August 7, 2002, the last day Thomas was seen alive; (3) Twilegar did not know that he had been seen digging the hole; (4) at the time he was digging the hole, Twilegar asked the only person in the area, Spencer, to leave the premises; (5) when Thomas was last seen later that night, he told his girlfriend he was going to go meet with Twilegar; (6) at that point, Thomas had in his possession an unusually large amount of cash; (7) Thomas’s body was later found buried in the same spot where Twilegar had been digging; (8) Thomas had been shot in close proximity to the grave site because he died within minutes of being shot and he was still alive when buried and had inhaled soil that was consistent with the grave site soil; (9) crime scene evidence supports the conclusion that the burial hole had been dug prior to the shooting because the investigator testified that the soil was extraordinarily difficult to excavate due to palmetto and other tree roots and yet the hole had been dug three or four feet deep and Thomas had died within minutes of being shot and was still alive when buried; (10) Thomas was shot in the upper back at close range with a twelve-gauge shotgun, at a downward angle, and Twilegar was known to possess such a weapon and to keep it in his tent; (11) Twilegar’s shotgun disappeared after the murder and has never been found; (12) immediately after the disappearance of Thomas, Twilegar fled the Fort Myers area and eventually settled at a secluded campsite in Tennessee; (13) in fleeing the area, Twilegar was involved in a series of uncharacteristic and extensive retail purchases that totaled thousands of dollars, all of which were paid in cash; and (14) after he was taken into custody, Twilegar made a number of incriminating phone calls that appear to implicate him in the murder.
 

 And second, competent, substantial evidence supports the conclusion that this evidence is inconsistent with any reasonable hypothesis of innocence proposed by Twilegar. Twilegar asserts various hypotheses of innocence: that Thomas’s wife was responsible for the killing, that Thomas’s girlfriend was responsible for the killing, that a drug dealer or other assailant happened upon Thomas on the Miramar Road property and killed him, or that Thomas was kidnapped and killed by an unknown assailant. Yet, all these hypotheses, reasonable or not, are inconsistent with a single evidentiary fact: Thomas was
 
 *190
 
 killed and buried at the same spot outside Twilegar’s tent where Twilegar had been seen digging a hole earlier on what was probably August 7, 2002, the last day Thomas was seen alive. There is no reasonable way to reconcile this evidentiary fact with any of Twilegar’s various hypotheses of innocence. Further, the totality of the evidentiary facts noted above is inconsistent with each of Twilegar’s hypotheses of innocence. Accordingly, Twilegar has failed to show that the trial court erred with respect to this claim.
 

 B.
 
 Sufficiency of the Evidence Showing Premeditation
 

 Twilegar contends that the trial court erred in concluding that the evidence is sufficient to support premeditation. We disagree. Premeditation is a factual issue for the jury,
 
 Asay v. State,
 
 580 So.2d 610, 612 (Fla.1991), and several standards of review are applicable. The following standard applies where the evidence of premeditation is direct, whether in whole or in part: as with other factual findings, a jury’s finding of premeditation will be sustained if supported by competent, substantial evidence in the record.
 
 See, e.g., Wheeler v. State,
 
 4 So.3d 599, 605 (Fla.),
 
 cert. denied,
 
 — U.S. -, 130 S.Ct. 178, 175 L.Ed.2d 112 (2009). Where the evidence of premeditation is wholly circumstantial, on the other hand, the following standard applies: not only must the evidence be sufficient to support the finding of premeditation, but the evidence, when viewed in the light most favorable to the State, must also be inconsistent with any other reasonable inference.
 
 Cochran v. State,
 
 547 So.2d 928, 930 (Fla.1989). The issue of inconsistency is a jury question and the verdict will be sustained if supported by competent, substantial evidence.
 
 Id.
 
 In the present case, the evidence of premeditation is circumstantial, and the latter standard of review applies.
 

 In the absence of an underlying statutorily enumerated felony, premeditation is the key element that separates first-degree murder from second-degree murder.
 
 Randall v. State,
 
 760 So.2d 892, 901 (Fla.2000). More than a mere intent to kill, premeditation is a fully-formed conscious purpose to kill.
 
 Wilson v. State,
 
 493 So.2d 1019, 1021 (Fla.1986). “This purpose to kill may be formed a moment before the act but must exist for a sufficient length of time to permit reflection as to the nature of the act to be committed and the probable result of that act.”
 
 Id.
 
 Premeditation is a factual issue to be determined by the jury and, like other factual matters, may be established by circumstantial evidence.
 
 Id.
 

 Evidence from which premeditation may be inferred includes such matters as the nature of the weapon used, the presence or absence of adequate provocation, previous difficulties between the parties, the manner in which the homicide was committed, and the nature and manner of the wounds inflicted. It must exist for such time before the homicide as will enable the accused to be conscious of the nature of the deed he is about to commit and the probable result to flow from it in so far as the life of his victim is concerned. No definite length of time for it to exist has been set and indeed could not be.
 

 Larry v. State,
 
 104 So.2d 352, 354 (Fla.1958). Where premeditation is sought to be proved by circumstantial evidence, the evidence must be inconsistent with every other reasonable inference.
 
 Cochran v. State,
 
 547 So.2d 928, 930 (Fla.1989). This question of inconsistency is for the jury to determine.
 
 Id.
 

 Applying the above law to the present case, we conclude that Twilegar has failed to show that the trial court
 
 *191
 
 erred in determining that the evidence is sufficient to support premeditation. First, competent, substantial evidence supports the finding of premeditation: (1) Twilegar was seen digging a hole near his tent at approximately 4 p.m. on what was probably August 7, 2002, the last day Thomas was seen alive; (2) when Thomas was last seen later that night, he told his girlfriend he was going to go meet with Twilegar, and he had in his possession an unusually large amount of cash; (3) Thomas’s body was later found buried in the same spot where Twilegar had been digging; (4) Thomas had been shot in the upper back at close range with a twelve-gauge shotgun, at a downward angle; (5) Thomas had been shot in close proximity to the grave site; (6) crime scene evidence supports the conclusion that the burial hole had been dug prior to the shooting; and (7) immediately after the disappearance of Thomas, Twilegar was involved in a series of uncharacteristic and extensive retail purchases that totaled thousands of dollars, all of which were paid in cash.
 

 And second, viewing the evidence in the light most favorable to the State, competent, substantial evidence supports the conclusion that the evidence is inconsistent with any reasonable inference other than premeditation. Any inference that the killing may have been accidental or impulsive is belied by three evidentiary facts: (1) Thomas was shot in the upper back at close range with a twelve-gauge shotgun, at a downward angle; (2) Thomas was killed and buried at the same spot outside Twilegar’s tent where Twilegar had been seen digging a hole earlier on what was probably August 7, 2002, the last day Thomas was seen alive; and (3) crime scene evidence supports the conclusion that the burial hole was dug prior to the shooting. There is no reasonable way to reconcile these evidentiary facts with any reasonable inference of an accidental or impulsive killing. Further, the totality of the evidentiary facts noted above is inconsistent with any such inference. Accordingly, Twilegar has failed to show that the trial court erred with respect to this claim.
 

 C.
 
 Motion to Suppress
 

 Twilegar contends that the trial court erred in denying his motion to suppress the evidence seized at the Tennessee campground. We disagree. This Court has explained that suppression issues are varied in nature and generally fall into three categories:
 

 Suppression issues are extraordinarily rich in diversity and run the gamut from (1) pure questions of fact, to (2) mixed questions of law and fact, to (3) pure questions of law. Reviewing courts must exercise care when examining such issues, for while the issues themselves may be posed in broad legal terms (e.g., whether a suspect was “in custody,” whether conduct by police constituted “interrogation”), the actual ruling is often discrete and factual (e.g., whether police did in fact tell a suspect he was free to go, whether police did in fact ask a suspect if he committed the crime). Appellate courts cannot use their review powers in such cases as a mechanism for reevaluating conflicting testimony and exerting covert control over the factual findings. As with all trial court rulings, a suppression ruling comes to the reviewing court clad in a presumption of correctness as to all fact-based issues, and the proper standard of review depends on the nature of the ruling in each case.
 

 State v. Glatzmayer,
 
 789 So.2d 297, 301 (Fla.2001)(footnotes omitted). The standard of review for each category is as follows:
 

 
 *192
 
 The following standards of review apply to trial court rulings in general: If the ruling consists of a pure question of fact, the ruling must be sustained if supported by competent substantial evidence.
 
 See, e.g.,
 
 Philip J. Padovano,
 
 Florida Appellate Practice
 
 § 9.6 (2nd ed.1997). If the ruling consists of a mixed question of law and fact addressing certain constitutional issues (e.g., probable cause, reasonable suspicion, the “in custody” requirement under
 
 Miranda,
 
 ineffectiveness of counsel), the ultimate ruling must be subjected to de novo review but the court’s factual findings must be sustained if supported by competent substantial evidence.
 
 See, e.g., Stephens v. State,
 
 748 So.2d 1028 (Fla.1999). If the ruling consists of a mixed question of law and fact addressing other issues (e.g., the dependency of a child, the propriety of a departure sentence, the presence of an aggravating circumstance), the ruling must be sustained if the trial court applied the right rule of law and its ruling is supported by competent substantial evidence.
 
 See, e.g., In re M.F.,
 
 770 So.2d 1189, 1192 (Fla.2000);
 
 Banks v. State,
 
 732 So.2d 1065, 1067 (Fla.1999);
 
 Willacy v. State,
 
 696 So.2d 693, 695 (Fla.1997). If the ruling consists of a pure question of law, the ruling is subject to de novo review.
 
 See, e.g.,
 
 Philip J. Padovano,
 
 Florida Appellate Practice
 
 § 9.4 (2nd ed.1997).
 

 Glatzmayer,
 
 789 So.2d at 301 n. 7. As discussed below, the suppression ruling in the present case is a mixed question of law and fact of the first type noted above, and while the trial court’s ultimate ruling must be subjected to de novo review, the court’s factual findings must be sustained if supported by competent, substantial evidence in the record.
 

 Fourth Amendment law governing the principle of exigent circumstances provides as follows:
 

 A warrantless search of a home is per se unreasonable and thus unconstitutional under the Fourth Amendment.
 
 Coolidge v. New Hampshire,
 
 403 U.S. 443, 454-55, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971). However, several exceptions to this rule have developed. One exception is the presence of an emergency situation which requires the police to assist or render aid.
 
 See Mincey v. Arizona,
 
 437 U.S. 385, 392, 98 S.Ct. 2408, 57 L.Ed.2d 290 (1978) (“[T]he Fourth Amendment does not bar police officers from making warrantless entries and searches when they reasonably believe that a person within is in need of immediate aid.”).
 
 Under this exception, police may enter a residence without a warrant if an objectively reasonable basis exists for the officer to believe that there is an immediate need for police assistance for the protection of life or substantial property interests. Rolling v. State,
 
 695 So.2d 278, 293-94 (Fla.1997). It is immaterial whether an actual emergency existed in the residence; only the reasonableness of the officer’s belief at the time of entry is considered on review.
 
 State v. Boyd,
 
 615 So.2d 786, 789 (Fla. 2d DCA 1993). However, this search must be “strictly circumscribed by the exigencies which justify its initiation.”
 
 Mincey, 437
 
 U.S. at 393, 98 S.Ct. 2408 (quoting
 
 Terry v. Ohio,
 
 392 U.S. 1, 26, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968)). Thus, an officer must cease a search once it is determined that no emergency exists.
 

 Seibert v. State,
 
 923 So.2d 460, 468 (Fla.2006) (emphasis added).
 

 Fourth Amendment law governing inventory searches by police provides as follows:
 

 An inventory search is a Fourth Amendment search and seizure,
 
 Elson v. State,
 
 
 *193
 
 337 So.2d 959 (Fla.1976), but is unique in that its purposes are for the protection of property and persons rather than to investigate criminal activity.
 
 Miller v. State,
 
 403 So.2d 1307 (Fla.1981). Contraband or evidence seized in a valid inventory search is admissible because the procedure is a recognized exception to the warrant requirement.
 
 Caplan v. State,
 
 531 So.2d 88 (Fla.1988). The nature of this exception, however, is determined by the nature of the intrusion.
 

 In
 
 South Dakota v. Opperman,
 
 428 U.S. 364, 96 S.Ct. 3092, 49 L.Ed.2d 1000 (1976), the United States Supreme Court discussed the protective, noncriminal basis of this particular intrusion and pointed out that the probable cause standard and the warrant requirement are not relevant to an inventory search analysis.
 
 The test is solely one of “reasonableness. ” The reasonableness of a purported inventory search is dependent upon it being a true good-faith inventory search and not a subterfuge for a criminal, investigatory search.
 
 If the search is not, in fact, an inventory search, then it must be justified on some other basis.
 

 Rolling v. State,
 
 695 So.2d 278, 294 (Fla.1997) (emphasis added).
 

 And Fourth Amendment law governing the abandonment of property provides as follows:
 

 “[A] Fourth Amendment search occurs when the government violates a subjective expectation of privacy that society recognizes as reasonable.”
 
 Kyllo v. United States,
 
 533 U.S. 27, 33, 121 S.Ct. 2038, 150 L.Ed.2d 94 (2001). The Supreme Court has “applied this principle to hold that a Fourth Amendment search does
 
 not
 
 occur ... unless ‘the individual manifested a subjective expectation of privacy in the object of the challenged search,’ and ‘society [is] willing to recognize that expectation as reasonable.’ ”
 
 Id.
 
 (quoting
 
 California v. Ciraolo,
 
 476 U.S. 207, 211, 106 S.Ct. 1809, 90 L.Ed.2d 210 (1986))....
 

 In contrast to property law, which defines the often subtle nuances of ownership, courts treat the concept of “abandonment” differently in the context of search and seizure law.
 
 “The test for abandonment is whether a defendant voluntarily discarded, left behind, or otherwise relinquished his interest in the property in question so that he could no longer retain a reasonable expectation of privacy with regard to it at the time of the search.”
 
 14A Fla. Jur. 2D
 
 Abandoned Property
 
 § 633 (2001);
 
 see Maxwell v. State,
 
 443 So.2d 967, 969 (Fla.1983);
 
 Riley v. State,
 
 266 So.2d 173 (Fla. 4th DCA 1972). “No search occurs when police retrieve property voluntarily abandoned by a suspect in an area where the latter has no reasonable expectation of privacy.”
 
 State v. Milligan,
 
 411 So.2d 946, 947 (Fla. 4th DCA 1982).
 

 State v. Lampley,
 
 817 So.2d 989, 990-91 (Fla. 4th DCA 2002) (emphasis added).
 

 Applying the above law to the present case, we conclude that Twilegar has failed to show that the trial court erred in denying his motion to suppress. Mr. and Mrs. Reaves, who were the campground hosts, and Deputy Holt all testified that when they came upon the Lot 8 campsite after dark on August 25, 2002, the campsite appeared to have been burglarized and ransacked or vandalized. The most expensive pieces of property — the refrigerator and generator — were gone, along with various other items, while many other items lay strewn about in the pouring rain. Deputy Holt suggested that perhaps the prudent thing to do was to remove the remaining items for safekeeping purposes; otherwise, the person who burglarized the campsite might return and
 
 *194
 
 take the remaining items. Because Mr. and Mrs. Reaves had no room at then-residence for the property, Deputy Holt took the property to the police station. Deputy Holt told Mr. and Mrs. Reaves that when the resident returned they should tell him what had happened and let him know where he could pick up his property. A day and a half later, when the resident failed to retrieve his property, Deputy Holt conducted an inventory review of the items, hoping to find information that would lead to the owner so he could return the property. When he was unable to identify the owner and when the resident failed to recover the property, the police ultimately retained possession of it.
 

 Under these circumstances, there was no Fourth Amendment violation in the initial seizure of the property,
 
 see Seibert v. State,
 
 923 So.2d 460, 468 (Fla.2006) (“[Police may enter a residence without a warrant if an objectively reasonable basis exists for the officer to believe that there is an immediate need for police assistance for the protection of ... substantial property interests.”), or in the inventory search,
 
 see Rolling v. State,
 
 695 So.2d 278, 294 (Fla.1997) (“The reasonableness of a purported inventory search is dependent upon it being a true good-faith inventory search and not a subterfuge for a criminal, investigatory search.”), for Deputy Holt removed the property for safekeeping purposes and he inventoried it for identification purposes, not for criminal, investigatory purposes. Further, to the extent police ultimately retained possession of the property, there was no illegal seizure because at that point Twilegar had abandoned the property,
 
 see State v. Lampley,
 
 817 So.2d 989, 991 (Fla. 4th DCA 2002) (“The test for abandonment is whether a defendant voluntarily discarded, left behind, or otherwise relinquished his interest in the property in question so that he could no longer retain a reasonable expectation of privacy with regard to it at the time of the search.”), for by his own admission Twilegar had no intention of retrieving the property due to an outstanding warrant for his arrest in Missouri. Accordingly, Twilegar has failed to show that the trial court erred with respect to this claim.
 

 D.
 
 Evidence Concerning the Victim
 

 Twilegar contends that the trial court erred in excluding certain evidence concerning the victim. We disagree. As a general rule, a trial court’s ruling concerning the admissibility of evidence will be sustained on review absent an abuse of discretion.
 
 Alston v. State,
 
 723 So.2d 148, 156 (Fla.1998). Yet a court’s discretion is not boundless, and it may be constrained by legal precepts such as the rules of evidence,
 
 Johnston v. State,
 
 863 So.2d 271, 278 (Fla.2003), and the principle of stare decisis.
 
 McDuffie v. State,
 
 970 So.2d 312, 326 (Fla.2007).
 

 Section 90.401, Florida Statutes (2007), defines relevant evidence thusly: “Relevant evidence is evidence tending to prove or disprove a material fact.” And section 90.402 provides that “[a]ll relevant evidence is admissible, except as provided by law.” § 90.402, Fla. Stat. (2007). Section 90.403 sets forth the following exclusion:
 

 90.403. Exclusion on grounds of prejudice or
 
 confusion.
 
 — Relevant
 
 evidence is inadmissible if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of issues, misleading the jury, or needless presentation of cumulative evidence.
 
 This section shall not be construed to mean that evidence of the existence of available third-party benefits is inadmissible.
 

 
 *195
 
 § 90.403, Fla. Stat. (2007) (emphasis added). The standard for applying this exclusion is as follows:
 

 This statute compels the trial court to weigh the danger of unfair prejudice against the probative value. In applying the balancing test, the trial court necessarily exercises its discretion. Indeed, the same item of evidence may be admissible in one case and not in another, depending upon the relation of that item to the other evidence.
 

 State v. McClain,
 
 525 So.2d 420, 422 (Fla.1988).
 

 Applying the above law to the present case, we conclude that Twilegar has failed to show that the trial court erred in its evidentiary rulings concerning the victim. First, with respect to the testimony of Thomas’s wife, Mary Ann Lehman, concerning Thomas’s prior arrest for conspiracy to kill her, Lehman testified in proffer that she had learned from police that Thomas was having an affair with Patricia Sweeney, that Thomas had been arrested for conspiracy to kill Lehman, that police possessed audio and video tapes that they could not reveal to her, and that the charges against Thomas had been dropped due to insufficient evidence. Based on this record, the court did not err in excluding this evidence, see
 
 Slocum v. State,
 
 757 So.2d 1246, 1251 (Fla. 4th DCA 2000) (“To open the door to evidence about an unrelated case was to create a trial within a trial; there was a risk that the trial would be needlessly lengthened and that the additional evidence would obscure the discovery of the truth.”), for the court reasonably may have concluded that the probative value of the evidence was substantially outweighed by the danger of prejudicing or confusing the jury.
 
 See
 
 § 90.403, Fla. Stat. (2007).
 

 Second, with respect to the proffered testimony of Twilegar’s niece, Jennifer Morrison, concerning Thomas’s alleged drug use and acceptance of sexual favors in lieu of back rent, the court excluded this testimony, concluding that the evidence was not sufficiently relevant or probative. Based on this record, the court did not err in this respect,
 
 see Hayes v. State,
 
 581 So.2d 121, 126 (Fla.1991) (“Although such evidence [of drug use] may be relevant in some circumstances, it was not relevant to any material issue on the facts of this case.”), for the court reasonably may have concluded that the probative value of the evidence was substantially outweighed by the danger of prejudicing or confusing the jury.
 
 See
 
 § 90.403, Fla. Stat. (2007).
 

 Third, with respect to the testimony of both Thomas’s prior girlfriend, Patricia Sweeney, concerning the conspiracy case against Thomas and his alleged drug use and the fact that she had seen him and a business associate waving guns at each other in 1998, and the testimony of David Twomey that he had seen Thomas at a convenience store sometime prior to the murder and Thomas had told him, “If anybody asks, you haven’t seen me,” the court excluded this evidence, concluding that the evidence was not sufficiently relevant or probative. Based on this record, the court did not err in this respect, for the court reasonably may have concluded that the probative value of the evidence was substantially outweighed by the danger of prejudicing or distracting or confusing the jury.
 
 See
 
 § 90.403, Fla. Stat. (2007). And fourth, with respect to the bank records from Thomas and Lehman’s Alliant Bank account in Montgomery from October 2001 to July 2002, the trial court ruled as follows: “I believe any minimal probative value, which at this juncture I find none, would be certainly — the exhibits would be more confusing than they would be probative of anything.” Based on this record, the court did not err in this re
 
 *196
 
 spect, for the court reasonably may have concluded that the probative value of the evidence was substantially outweighed by the danger of confusing the jury.
 
 See
 
 § 90.403, Fla. Stat. (2007). Accordingly, Twilegar has failed to show that the trial court erred with respect to this claim.
 

 E.
 
 Evidence of Flight
 

 Twilegar contends that the trial court erred in admitting evidence of Twilegar’s flight from Fort Myers and from the Tennessee campground following the murder. We disagree. The Court has addressed the admissibility of evidence of flight to prove consciousness of guilt:
 

 We agree, as an abstract rule of law, that evidence of flight, concealment, or resistance to lawful arrest after the fact of a crime is admissible as “being relevant to consciousness of guilt which may be inferred from such circumstances.”
 
 Straight v. State,
 
 397 So.2d at 903, 908 (Fla.1981). However, in applying this principle to a particular case,
 
 there must be evidence which indicates a nexus between the flight, concealment, or resistance to lawful arrest and the crime(s) for which the defendant is being tried in that specific case.
 
 This is necessary in the application of this rule of law since the evidence creates an inference of a consciousness of guilt of the crime for which the defendant is being tried in that case.
 
 See Merritt v. State,
 
 523 So.2d 573, 574 (Fla.1988).
 
 The ultimate admissibility issue is the relevance to the charged crime.
 

 Escobar v. State,
 
 699 So.2d 988, 995 (Fla.1997) (emphasis added). The Court earlier had noted the following caveat:
 

 [T]he cases in which flight evidence has been held inadmissible have contained particular facts which tend to detract from the probative value of such evidence. For instance, the probative value of flight evidence is weakened: 1) if the suspect was unaware at the time of the flight that he was the subject of a criminal investigation for the particular crime charged; 2) where there were not clear indications that the defendant had in fact fled; or, 3) where there was a significant time delay from the commission of the crime to the time of flight. The interpretation to be gleaned from an act of flight should be made with a sensitivity to the facts of the particular case.
 

 Bundy v. State,
 
 471 So.2d 9, 21 (Fla.1985) (citations omitted).
 

 Applying the above law to the present case, we conclude that Twilegar has failed to show that the trial court erred in admitting evidence of Twilegar’s flight from Fort Myers and from the Tennessee campground following the murder. The key question here is whether there is a sufficient nexus between the murder, on the one hand, and Twilegar’s flight, on the other, to allow jurors to fairly infer consciousness of guilt. The following eviden-tiary facts support admission of this evidence: (1) Twilegar returned with Thomas from Alabama on August 6, 2002, and was seen in his company late that night; (2) when Thomas was last seen, during the evening of August 7, 2002, he said he was going to go meet with Twilegar, and Thomas had in his possession an unusually large amount of cash; (3) Thomas was murdered and buried just outside Twile-gar’s tent at the Miramar Road location; (4) Thomas was killed with a twelve-gauge shotgun, and Twilegar was known to possess such a weapon and to keep it in his tent; and (5) immediately after the disappearance of Thomas, Twilegar fled the Fort Myers area and was involved in a series of uncharacteristic and extensive retail purchases that totaled thousands of dollars, all of which were paid in cash.
 

 
 *197
 
 Based on this record, the court did not err in admitting the evidence of flight, for the court reasonably may have concluded that the probative value of the evidence was not substantially outweighed by the danger of prejudicing or misleading the jury.
 
 See
 
 § 90.403, Fla. Stat. (2007). Further, Twilegar’s allegation that he was fleeing because of a Missouri warrant or because of his drug dealing or because of his involvement in a meth lab in Tennessee is a nonissue, for even if he were fleeing for all those reasons, he reasonably could have been fleeing because of the murder as well.
 
 See Randall v. State,
 
 760 So.2d 892, 900 (Fla.2000) (“Here, we find a sufficient evidentiary nexus in the record to have permitted the jury to reasonably infer that appellant’s flight on June 27,1996, was related to Randall’s consciousness of guilt as to the Evans and Pugh murders as well as to the Massachusetts probation violation.”). Accordingly, Twilegar has failed to show that the trial court erred with respect to this claim.
 

 F.
 
 Jailhouse Phone Calls
 

 Twilegar contends that the trial court erred in admitting tapes of Twilegar’s jailhouse phone calls. We disagree. The Confrontation Clause provides that “[i]n all criminal prosecutions, the accused shall enjoy the right to ... be confronted with the witnesses against him.” U.S. Const, amend. VI. This Court in
 
 Globe v. State,
 
 877 So.2d 663 (Fla.2004), addressed a Confrontation Clause issue and held that the clause was not implicated where Globe and his codefendant, Busby, speaking together to a law enforcement officer, gave a joint taped statement in which they admitted killing a fellow inmate and where the tape was played at trial. The Court reasoned thusly:
 

 We have previously recognized that admissions by acquiescence or silence do not implicate the Confrontation Clause.
 
 See Nelson v. State,
 
 748 So.2d 237 (Fla.1999);
 
 see also United States v. Kehoe,
 
 310 F.3d 579, 590-91 (8th Cir.2002) (holding that the Confrontation Clause did not guarantee the defendant the right to cross-examine a speaker whose statements were imputed to the defendant as adoptive admissions of a party opponent), cert. denied, 538 U.S. 1048, 123 S.Ct. 2112, 155 L.Ed.2d 1089 (2003).
 

 In
 
 Nelson,
 
 we held that because the codefendant’s statements were admitted as admissions by silence, there could be no Confrontation Clause violation. We presented several factors that should be present to show that an acquiescence to the codefendant’s statements did in fact occur. These factors include the following:
 

 1. The statement must have been heard by the party claimed to have acquiesced.
 

 2. The statement must have been understood by [the defendant],
 

 3. The subject matter of the statement is within the knowledge of the [defendant].
 

 4. There were no physical or emotional impediments to the person responding.
 

 5. The personal make-up of the speaker or his relationship to the party or event are not such as to make it unreasonable to expect a denial.
 

 6. The statement itself must be such as would, if untrue, call for a denial under the circumstances.
 

 See Nelson,
 
 748 So.2d at 242 (quoting
 
 Privett v. State,
 
 417 So.2d 805, 806 (Fla. 5th DCA 1982)).
 
 The essential inquiry thus becomes whether a reasonable person would have denied the statements under the circumstances.
 

 Globe,
 
 877 So.2d at 672-73 (emphasis added).
 

 
 *198
 
 The Court in
 
 Globe
 
 concluded as follows, based on the adoptive admissions exclusion to the hearsay rule:
 

 In this case, Globe was present during Busby’s statement and had a chance to contradict what Busby said. A review of the transcript in this case makes it clear that Busby’s statements were adopted by Globe. Instead of contradicting Busby’s statements, Globe verbally affirmed what Busby said and added significant details to Busby’s statement. The statements were properly admitted as adoptive admissions pursuant to section 90.803(18)(b). As we previously noted, statements admitted as adoptive admissions do not implicate the Confrontation Clause.
 

 Globe,
 
 877 So.2d at 673. An adoptive admission is defined as follows: “A statement of which the party has manifested an adoption or belief in its truth.” § 90.803(18)(b), Fla. Stat. (2007).
 

 Applying the above law to the present case, we conclude that Twilegar has failed to show that the trial court erred in admitting the tapes of his jailhouse phone calls. First, to the extent Twilegar claims that use of the tapes constituted a Confrontation Clause violation, the Court’s ruling in
 
 Globe
 
 is dispositive. As was the case in
 
 Globe,
 
 Twilegar was a knowing and active participant in the recorded conversations and he too, as did Globe, had ample opportunity to refute or contradict any of the statements that were adverse to his interests; instead, he acquiesced in the statements. To claim now that he is entitled to cross-examine the other participants in the conversations is disingenuous in light of the fact that he had previously acquiesced in their statements. As in
 
 Globe,
 
 the statements were properly admitted as adoptive admissions under section 90.803(18)(b), Florida Statutes (2007). As to whether the trial court erred in admitting the tapes in light of fact that use of the tapes could compel Twile-gar to disclose his alleged drug dealing in order to explain certain statements in the tapes, the court did not err in this respect, for the court reasonably may have concluded that the probative value of the evidence was not substantially outweighed by the danger of prejudicing the jury.
 
 See
 
 § 90.403, Fla. Stat. (2007). Accordingly, Twilegar has failed to show that the trial court erred with respect to this claim.
 

 H.
 
 Receipts for Retail Purchases
 

 Twilegar contends that the trial court erred in admitting the receipts for retail purchases found at the Tennessee campsite. The business record exception to the hearsay rule provides as follows in relevant part:
 

 (6) RECORDS OF REGULARLY CONDUCTED BUSINESS ACTIVITY.—
 

 (a) A memorandum, report, record, or data compilation, in any form, of acts, events, conditions, opinion, or diagnosis, made at or near the time by, or from information transmitted by, a person with knowledge, if kept in the course of a regularly conducted business activity and if it was the regular practice of that business activity to make such memorandum, report, record, or data compilation, all
 
 as shown by the testimony of the custodian or other qualified witness,
 
 or as shown by a certification or declaration that complies with paragraph (c) and s. 90.902(11), unless the sources of information or other circumstances show lack of trustworthiness. The term “business” as used in this paragraph includes a business, institution, association, profession, occupation, and calling of every kind, whether or not conducted for profit.
 

 
 *199
 
 § 90.803(6)(a), Fla. Stat. (2007) (emphasis added). To lay a proper foundation for use of business records, certain steps must be taken:
 

 In order to lay a foundation for the admission of a business record, it is necessary to call a witness who can show that each of the foundational requirements set out in the statute is present. It is not necessary to call the person who actually prepared the document. The records custodian or any qualified witness who has the necessary knowledge to testify as to how the record was made can lay the necessary foundation.
 

 Forester v. Norman Roger, Jewell & Brooks Int’l, Inc.,
 
 610 So.2d 1369, 1373 (Fla. 1st DCA 1992) (citation omitted).
 

 Applying the above law to the present case, we conclude that the trial court erred in initially admitting the retail receipts through the testimony of Deputy Holt without first requiring the State to establish a sufficient foundation, but the error was cured as to most of the receipts and was harmless as to the others, as explained below. Deputy Holt testified that after he removed property from the campsite at Lot 8, he found a number of retail receipts in an unlocked briefcase. He then read to the jury numerous receipts, reciting the name of each business and the date of each receipt and sometimes the amount and whether the purchase was made in cash. He explained that the dates ranged from August 3, 2002, to August 22, 2002, and that the locations began in Florida and ended in Tennessee. He testified that, using the receipts, he had mapped out the dates on a calendar in an effort to identify the owner of the property. Later at trial, two Wal-Mart employees and a NAPA employee testified in detail concerning the contents of the numerous receipts from their businesses: they testified as to the dates of the purchases, the amounts of the purchases, the items purchased, whether the purchases were in cash, and the amounts tendered.
 

 On this record, the trial court erred in admitting the receipts through the testimony of Deputy Holt, for the receipts were admitted for the truth of the matters asserted (the dates of the purchases, the amounts, the locations, and whether the purchases were made in cash) and Deputy Holt was not qualified to, and did not attempt to, attest to the fact that the receipts were records of regularly conducted business activity for the respective businesses. However, the error was cured as to the Wal-Mart and NAPA receipts when employees of those businesses subsequently testified concerning the business practices of their companies in this respect, for each of those witnesses possessed sufficient knowledge to attest to such matters. As for the remaining receipts, only two are significant: one from 7-Eleven dated August 8, 2002, at 12:39 a.m., in the amount of $688.97, for three cell phones and other supplies, for which cash was paid; and one from Sam’s Club dated August 14, 2002, in the amount of $435.56, for a generator, for which cash was paid. However, in light of Jennifer Morrison’s testimony concerning the events of late night August 7, 2002, and early morning August 8, 2002, with respect to Twilegar’s purchases at 7-Eleven, and in light of the copious other evidence of retail purchases that was properly admitted, the admission of these receipts was harmless.
 
 See State v. DiGuilio,
 
 491 So.2d 1129, 1139 (Fla.1986) (“The question is whether there is a reasonable possibility that the error affected the verdict.”). Accordingly, although Twilegar has shown that the trial court erred with respect to this claim, the error was cured in part and is harmless in part.
 

 
 *200
 
 H.
 
 Pecuniary Gain, CCP, and Proportionality
 

 With respect to this claim, Twile-gar contends that the trial court erred in finding pecuniary gain and CCP as aggravating circumstances, and he contends that his death sentence is disproportionate. We disagree. With respect to the standard of review for aggravating circumstances, the Court has held that it is not this Court’s job to reweigh the evidence to determine whether the State proved each aggravating circumstance beyond a reasonable doubt, for that is the trial court’s job.
 
 Willacy v. State,
 
 696 So.2d 693, 695 (Fla.1997). “Rather, our task on appeal is to review the record to determine whether the trial court applied the right rule of law for each aggravating circumstance and, if so, whether competent substantial evidence supports its finding.”
 
 Id.
 

 First, with respect to the pecuniary gain aggravating circumstance, the Court has held that “[i]n order to establish this aggravating factor, the State must prove beyond a reasonable doubt that the murder was motivated, at least in part, by a desire to obtain money, property, or other financial gain.”
 
 Finney v. State,
 
 660 So.2d 674, 680 (Fla.1995). In the present case, the trial court applied the proper rule of law for this aggravating circumstance,
 
 [6]
 
 and the court’s finding that this aggravator was established is supported by competent, substantial evidence.
 
 [7]
 
 Second, with respect to the CCP aggravating circumstance, the Court has held as follows:
 

 Thus, in order to find the CCP aggravating factor under our case law, the jury must determine that the killing was the product of cool and calm reflection and not an act prompted by emotional frenzy, panic, or a fit of rage (cold);
 
 and
 
 that the defendant had a careful plan or prearranged design to commit murder before the fatal incident (calculated);
 
 and
 
 that the defendant exhibited heightened premeditation (premeditated);
 
 and
 
 that the defendant had no pretense of moral or legal justification.
 

 Jackson v. State,
 
 648 So.2d 85, 89 (Fla.1994) (citations omitted). In the present case, the court applied the proper rule of law for this aggravating circumstance,
 
 [8]
 
 and
 
 *201
 
 the court’s finding that this aggravator was established is supported by competent, substantial evidence.
 
 [9]
 

 And third, with respect to proportionality review, the Court has explained its role as follows:
 

 Because death is a unique punishment, it is necessary in each case to engage in a thoughtful, deliberate proportionality review to consider the totality of circumstances in a case, and to compare it with other capital cases. It is not a comparison between the number of aggravating and mitigating circumstances.
 

 Porter v. State,
 
 564 So.2d 1060, 1064 (Fla.1990) (citation omitted). In the present case, a review of the totality of the circumstances in this case shows that this case is comparable to other such cases where a sentence of death was imposed.
 
 [10]
 
 Accordingly, we conclude that Twilegar has failed to show that the trial court erred with respect to this claim.
 

 I.
 
 Waiver of a Penalty Phase Jury, of Investigation Into Mitigation, and of Presentation of Mitigation
 

 The Court reviews a trial court’s decision with respect to the waiver of mitigation as a mixed question of law and fact, upholding the court’s factual findings if supported by competent, substantial evidence, and reviewing the court’s ultimate decision de novo.
 
 See, e.g., Mora v. State,
 
 814 So.2d 322 (Fla.2002);
 
 Chandler v. State,
 
 702 So.2d 186 (Fla.1997). The Court in
 
 Koon v. Dugger,
 
 619 So.2d 246 (Fla.1993), addressed the issue of waiver of mitigation and set forth the following guidelines:
 

 Although we find that no error occurred here, we are concerned with the problems inherent in a trial record that does not adequately reflect a defendant’s waiver of his right to present any mitigating evidence. Accordingly, we establish the following prospective rule to be
 
 *202
 
 applied in such a situation. When a defendant, against his counsel’s advice, refuses to permit the presentation of mitigating evidence in the penalty phase, counsel must inform the court on the record of the defendant’s decision. Counsel must indicate whether, based on his investigation, he reasonably believes there to be mitigating evidence that could be presented and what that evidence would be. The court should then require the defendant to confirm on the record that his counsel has discussed these matters with him, and despite counsel’s recommendation, he wishes to waive presentation of penalty phase evidence.
 

 Koon,
 
 619 So.2d at 250. The Court subsequently explained the
 
 Koon
 
 rationale thusly:
 

 Obviously, our primary reason for requiring this procedure was to ensure that a defendant understood the importance of presenting mitigating testimony, discussed these issues with counsel, and confirmed in open court that he or she wished to waive presentation of mitigating evidence. Only then could the trial court, and this Court, be assured that the defendant knowingly, intelligently, and voluntarily waived this substantial and important right to show the jury why the death penalty should not be imposed in his or her particular case.
 

 Chandler v. State,
 
 702 So.2d 186, 199 (Fla.1997).
 

 Applying the above law to the present case, we conclude that Twilegar has failed to show that the trial court erred with respect to this claim. Prior to trial, defense counsel notified the court of Twilegar’s desire to waive a penalty phase jury, to waive investigation into mitigation, and to waive the presentation of mitigation, and the court held hearings and conducted extensive inquiries into these matters. In support of his waivers, Twilegar executed an affidavit wherein he stated that he was invoking his constitutional right “to prevent my attorney(s) from presenting mitigating evidence to a penalty phase jury in my defense,” and giving the following reasons:
 

 (3) I have certain INALIENABLE RIGHTS TO PRIVACY, which I believe would be invaded if counsel were allowed to proceed.
 

 (4) I believe any mitigating arguments on my behalf by counsel, would be an ADMISSION OF GUILT AND OR LIABILITY which would be in direct violation of my PROSCRIBED RELIGIOUS EDICTS.
 

 (5) I HAVE DISCUSSED IN DEPTH these issues with assigned counsel and I am aware of the potential ramifications of not having the benefit of counsel, expert(s) and witnesses testify on my behalf.
 

 (6) Further, I understand that any issues I forbid to come forth, are issues that I may be FOREVER BARRED from raising during appeals.
 

 At the subsequent hearing, the following exchange took place between the court and defense counsel:
 

 THE COURT: Two things, I believe, and correct me if I am wrong, we needed to address. One was Mr. Twilegar’s desire to waive the presentation of mitigating evidence?
 

 MR. MCLOUGHLIN: And investigation.
 

 When the trial court asked Twilegar what he was requesting, he responded:
 

 THE DEFENDANT: I’m requesting that my counsel do no investigation for mitigation. Do not prepare for it in any way except just to cover themselves. Whatever is statutory that they have to do because I plan on no mitigation at all.
 

 
 *203
 
 Defense counsel had enlisted both a mitigation specialist, who had discussed mitigation with Twilegar, and a psychiatrist, who had attempted to meet with Twilegar but Twilegar had refused to cooperate. Trial counsel informed the court that Twilegar’s background may lead to “good mitigation” but he could not complete his investigation, and counsel noted a “possible good deed done by Mr. Twilegar that we weren’t able to further investigate.” Twilegar also refused to cooperate with trial counsel’s attempt to gather mitigation from family and friends. Counsel stated that hypothetically if he were to present mitigation, he would call as witnesses “[pjossibly his sister, his wife, his mother,” and counsel told the court that he had provided Twilegar with updated mitigation materials, and that he, his co-counsel and the mitigation specialist had all discussed the waiver issue with Twilegar but he had remained adamant.
 

 Twilegar stated that trial counsel had met with him dozens of times to discuss the mitigation issue and that counsel had recommended every time that mitigation be presented but Twilegar had insisted on waiving both the investigation into mitigation and the presentation of mitigation, stating: “I forbid them to investigate. There is just eertin things I don’t want brought up for any circumstance, therefore, if they can’t investigate, they can’t present.” He added: “I don’t want my background drug through the dirt any more than it has been.” And: “It’s my life. It’s private and I’m keeping it that way. It’s been that way all my life and I’m going to keep it private.” He told the court: “I also, when it come right down to it, if I’m convicted and I would rather do the death penalty and just get it over with then_ Let’s just get it over with. I know when I wake up in the next life I’m not going to-be in jail.”
 

 Counsel told the court: “If we do proceed with the investigation, Mr. Twilegar will fire us, and I think that would be of greater harm to him than for us to [respect his wishes concerning mitigation].” When questioned by the trial court and the State numerous times if he understood that prohibiting investigation could limit the mitigation presented if he later chose to present a case, Twilegar replied that he understood. Twilegar further stated that he accepted that his actions barred him from raising the issue on appeal. Trial counsel stated that Twilegar was intelligent and self-educated, that counsel had met with him frequently and that there was no question in his mind that he was competent. Twilegar stated that he had no history of mental illness, that his mental faculties were not impaired and that he had never been under the care of a mental health professional. The trial court found that he was competent and accepted his waivers.
 

 The court revisited the issue throughout the trial and gave Twilegar repeated opportunities to reconsider. At the
 
 Spencer
 
 hearing, pursuant to the court’s direction, the State presented in mitigation a Missouri presentence investigation report and a Missouri psychiatric report concerning Twilegar, and Twilegar himself presented Thomas’s last will and testament and a booking report and probable cause affidavit concerning Thomas’s arrest for conspiracy to murder his wife. The mitigation offered by the State indicated that Twile-gar had no mental illness and that his most recent IQ score was 102. At the hearing on Twilegar’s motion for a new trial, defense counsel submitted, and the court accepted, the written arguments that counsel had prepared for the penalty phase and also the written arguments that counsel had prepared for the
 
 Spencer
 
 hearing. The court also considered the presentence investigation report that had been pre
 
 *204
 
 pared for this case. Prior to the court’s pronouncing sentence, Twilegar read a prepared statement wherein he proclaimed his innocence and again sought to cast suspicion on Thomas’s wife. Based on the foregoing, we conclude that Twilegar’s waiver of a penalty phase jury, waiver of investigation into mitigation and waiver of the presentation of mitigation were knowing, intelligent and voluntary, and that the trial court did not err in granting these waivers. Accordingly, Twilegar has failed to show that the trial court erred with respect to this claim.
 

 III. CONCLUSION
 

 With the single exception noted above, we conclude that Twilegar has failed to show that the trial court erred with respect to the above claims. As for the claim concerning the admission of receipts for retail purchases, we conclude that the trial court erred in initially admitting the receipts without first requiring the State to establish a sufficient foundation, but that the court’s error was cured by later testimony or was harmless, as explained above. We conclude that the conviction for premeditated first-degree murder is supported by the evidence, and that the sentence of death is proportionate. We affirm Twilegar’s conviction and sentence.
 

 It is so ordered.
 

 QUINCE, C.J., and PARIENTE, LEWIS, CANADY, POLSTON, LABARGA, and PERRY, JJ., concur.
 

 [1]
 

 .
 
 Spencer v. State,
 
 615 So.2d 688, 690-91 (Fla.1993) C‘[T]he trial judge should hold a hearing to: a) give the defendant, his counsel, and the State, an opportunity to be heard; b) afford, if appropriate, both the State and the defendant an opportunity to present addition
 
 *188
 
 al evidence; c) allow both sides to comment on or rebut information in any presentence or medical report; and d) afford the defendant an opportunity to be heard in person.”).
 

 [2]
 

 . The court found that the following aggravating circumstances had been established, with the following weights; (1) the capital felony was committed for pecuniary gain (great weight); and (2) the capital felony was committed in a cold, calculated and premeditated manner (CCP) (great weight).
 

 [3]
 

 . The court found that the following nonstatu-tory mitigating circumstances had been established, with the following weights: (1) the defendant had a disadvantaged and dysfunctional family background and childhood (little weight); (2) the defendant had received a limited formal education in that he had completed only the seventh grade (little weight); (3) the defendant had abused drugs as a teenager (very little weight); and (4) the alternative punishment to death is life in prison without parole (significant weight).
 

 [4]
 

 .Twilegar raises the following issues in his present appeal: (1) whether the trial court erred in concluding that the evidence is sufficient to prove that Twilegar committed the crime; (2) whether the trial court erred in concluding that the evidence is sufficient to support premeditation; (3) whether the trial court erred in denying Twilegar's motion to suppress the evidence seized at the Tennessee campground; (4) whether the trial court erred in excluding evidence concerning the victim; (5) whether the trial court erred in admitting evidence of flight; (6) whether the trial court erred in admitting Twilegar’s jailhouse phone calls; (7) whether the trial court erred in admitting Twilegar’s receipts for retail purchases; (8) whether the trial court erred in finding pecuniary gain and CCP as aggravators and whether Twilegar’s death sentence is proportionate; and (9) whether the trial court erred in allowing Twilegar to waive a penalty phase jury and to waive both the investigation and presentation of mitigation.
 

 [5]
 

 . The record shows that no one witnessed the murder, no physical evidence links Twilegar directly to the murder, Twilegar did not confess to the murder, and Twilegar made no directly incriminating statements concerning the murder.
 

 [6]
 

 . The court stated in its sentencing order that "[t]he capital felony was committed for pecuniary gain, Florida Statutes 921.141(5)(f).”
 
 See
 
 § 921.141(5)(f), Fla. Stat. (2007). The court then listed extensive evidentiary findings supporting this aggravator.
 

 [7]
 

 . According to the record, on the morning of August 6, 2002, Thomas withdrew $25,000 in cash from a bank in Montgomery; the next evening, the night that Thomas was last seen alive, Thomas visited Fabina at her job at 7 or 7:30 p.m., and she noticed that he had an unusually large amount of cash in his wallet; when Thomas’s body was found, his wallet was missing; as payment for Spencer leaving the Miramar Road property on die day he had seen Twilegar digging the hole by the tent, Twilegar left a $100 bill, which Spencer found the next day at the prearranged spot; and on the night when Thomas was last seen alive and during the following days, Twilegar was involved in a series of uncharacteristic and extensive retail purchases that totaled thousands of dollars, all of which were paid in cash.
 

 [8]
 

 .In its sentencing order, the court cited this Court’s decision in
 
 Diaz v. State,
 
 860 So.2d 960 (Fla.2003), noting as follows:
 

 A murder is cold, calculated, and premeditated, for use as death penalty aggra-vator, when the evidence shows that the killing was the product of cool and calm reflection and not an act prompted by emotional frenzy, panic, or a fit of rage; "cold,” meaning that the Defendant had a careful plan or prearranged design to commit murder before the fatal incident; "calculated," meaning that the Defendant exhibited heightened premeditation; "premeditated,” meaning that the Defendant had no pretense of moral or legal justification.
 
 See Diaz v. State,
 
 860 So.2d 960 (Fla.2003).
 
 *201
 
 The facts of this case establish this aggravating circumstance beyond a reasonable doubt.
 

 See
 
 § 941. 141(5)(i), Fla. Stat. (2007).
 

 [9]
 

 . According to the record, Twilegar was seen digging a hole near his tent at approximately 4 p.m. on what was probably August 7, 2002, the last day Thomas was seen alive; when Thomas was last seen later that night, he told his girlfriend he was going to go meet with Twilegar, and he had in his possession an unusually large amount of cash; Thomas’s body was later found buried in the same spot where Twilegar had been digging; Thomas had been shot in the upper back at close range with a twelve-gauge shotgun, at a downward angle; Thomas had been shot in close proximity to the grave site; crime scene evidence supports the conclusion that the burial hole had been dug prior to the shooting; and immediately after the disappearance of Thomas and in the following days, Twilegar was involved in a series of uncharacteristic and extensive retail purchases that totaled thousands of dollars, all of which were paid in cash.
 

 [10]
 

 .
 
 See, e.g., Diaz v. State,
 
 860 So.2d 960 (Fla.2003) (aggravators: CCP and prior violent felony; mitigation; both mental miti-gators, age, lack of significant criminal history, remorse, and history of family violence);
 
 Hauser
 
 v.
 
 State,
 
 701 So.2d 329 (Fla.1997) (aggravators; HAC, CCP and pecuniary gain; mitigation: no significant history of prior criminal activity, good attitude and conduct in jail, cooperated fully with police, was under the influence of drugs or alcohol and emotional or mental health problems since he was fourteen years old);
 
 Shellito v. State,
 
 701 So.2d 837 (Fla.1997) (aggravators: prior violent felony and pecuniary gain/commission during a robbery; mitigation: alcohol abuse, mildly abusive childhood, difficulty reading and learning disability);
 
 Melton v. State,
 
 638 So.2d 927 (Fla.1994) (aggravators: pecuniary gain and prior violent felony; mitigation: difficult family background and good conduct while awaiting trial);
 
 Hayes v. State,
 
 581 So.2d 121 (Fla.1991) (aggravators: CCP and committed during course of a robbery; mitigation: age, low intelligence, developmentally disabled and product of a deprived environment).