# Supreme Court of Florida

————————

No. SC13-46

————————

**MARVIN CANNON,**
Appellant,

vs.

**STATE OF FLORIDA,**
Appellee.

[September 24, 2015]

PER CURIAM.

This case is before the Court on appeal from a judgment of conviction of first-degree murder and a sentence of death. We have jurisdiction. See art. V, § 3(b)(1), Fla. Const. For the reasons stated below, we affirm the convictions and sentences, including the sentence of death.

## FACTS AND PROCEDURAL HISTORY

Sean Neel and Zechariah[1] Morgan were coworkers at Florida State Hospital and had been friends for over twenty years. In the fall of 2010, Mr. Morgan and

_____

1. The record presents some inconsistency as to the spelling of this victim's first name. We will refer to him as Mr. Morgan.

Mr. Neel became involved in the purchase of corn, known as "deer corn," from the defendant, Marvin Cannon. On December 24, 2010, Mr. Morgan and Mr. Neel drove to a convenience store to pick up Cannon. Mr. Neel understood the purpose of this trip to be the completion of a corn purchase. While waiting at the store, the two men noticed two people walking down the street toward them. Mr. Neel had never met or spoken with Cannon, but was familiar with Cannon's father. Because of Cannon's resemblance to his father, Mr. Neel recognized Cannon as one of the two men walking toward the truck, but did not recognize the other man. Mr. Neel would later discover that the second man's name was Anton[2] McMillian. Cannon and McMillian walked to Mr. Morgan's side of the truck, and Mr. Morgan began to explain that there was no additional room in the truck for anyone other than Cannon. Mr. Morgan was driving a four-door, Ford "King Ranch" truck with a crew cab. Cannon told them McMillian was his cousin from New York and that Cannon wanted him to ride with them also. After some discussion, Mr. Morgan agreed, and he and Mr. Neel began clearing the back seat by stacking the newspapers, jackets, and other items in the center of the back seat so Cannon and McMillian could sit on either side. Among these items was a knife that Mr.

---

2. There is some inconsistency in the record as to the spelling of the codefendant's first name. We will refer to him as "McMillian."

Morgan placed in the center console.[3]  When the seats were cleared, Cannon sat on the back passenger side behind Mr. Neel and McMillian sat directly behind Mr. Morgan on the driver's side.

At Cannon's direction, Mr. Morgan drove onto Interstate Highway 10 (I-10). The four men conversed while driving and eventually turned off of I-10 onto Flat Creek Road.  While they were heading west on Flat Creek Road, Cannon informed them that they had missed their turn, and Mr. Morgan made a U-turn.  As Mr. Morgan drove eastbound for about two miles, he inquired of Cannon about Cannon's familiarity with the area and how Cannon could let them travel two miles past where they were supposed to have turned, to which Cannon responded, "oh, we was talking" and "it just slipped my mind."  During the drive, Mr. Neel was "quartered around" in the front passenger seat with his head turned, looking directly at McMillian and conversing with him.  Cannon eventually directed them onto a little dirt road, described by Mr. Neel as a "little pig trail," in an overgrown, wooded area.  As soon as they turned onto this dirt road, Mr. Neel heard Cannon fumbling in his jacket and saw Mr. Morgan turn around and look directly at Cannon.  Cannon then began to talk as though he were on the phone; however, Mr.

_____

3. The front seats were bucket seats, not bench seats, and there was a gap between them containing a center console.

Neel was unsure whether Cannon had a cell phone because Mr. Neel was only looking at McMillian and did not turn to see Cannon.

Cannon then directed Mr. Morgan to turn behind an old, abandoned house. As Mr. Morgan made this turn, Mr. Neel glanced behind the house and simultaneously heard Cannon moving in the backseat. Suddenly, Mr. Neel was stabbed twice in the neck from behind. He testified that upon the first stab, he "looked right back at . . . McMillian," who was sitting still in the same spot as before. Mr. Neel testified that although he could not see around his seat to see Cannon stabbing him, he knew it was Cannon because Mr. Neel was "looking right at [McMillian]" and "could tell 100 percent" that McMillian was not the one stabbing him.

As soon as Mr. Neel was stabbed, Mr. Morgan "looked dead at [Cannon]" and began to scream—"[l]ike a scared-to-death holler." Mr. Morgan floored the gas pedal, and Mr. Neel grabbed the knife in the console and also grabbed for the door handle. The truck was now "all over the place. . . . fishtailing everywhere," and when the door sprung open, Mr. Neel flew out of the truck, losing his shoes, his hat, and the knife he had in his hand. When Mr. Neel got back on his feet, he looked back in time to see the truck plow into a tree next to an old shed. He did not see anyone at or near the truck and began running back up the dirt road to get help.

Upon reaching Flat Creek Road, Mr. Neel saw some people at a nearby home and ran toward them, yelling that they needed to "get the guns" and that his friend still needed help. The home belonged to the Renfroes. Upon seeing Mr. Neel, Vera Renfroe called 911 and ran toward Mr. Neel to help him. Some of the men from the home, who had retrieved their firearms, saw a man standing at the edge of the dirt road. Mr. Neel glanced in that direction, but could not say for certain which of the two men from the truck it could have been. Mrs. Renfroe also noticed this individual standing there looking around, but was not close enough to be able to identify him. The man eventually turned and ran in another direction toward a pond.

Alan Parrot, one of the men who had retrieved a firearm, drove his car toward the pond and found McMillian near the pond, looking confused and trying to run away. Mr. Parrot exited his vehicle and held his gun on McMillian until the police arrived. Shortly thereafter, Officer Michael Lawrence of the Gretna Police Department arrived. After Officer Lawrence handcuffed and put McMillian in the back seat of his patrol car, he and Mr. Parrot ran over to where Mr. Morgan's truck had crashed into the tree. They saw Mr. Morgan's body on the ground near the driver's side door, checked his pulse, and determined that he was deceased. Other officers began to arrive on the scene and eventually someone noticed smoke

coming from Mr. Morgan's vehicle. When the passenger-side door was opened, the cab of the truck was engulfed in flames.

Lead Investigator Robbie Maxwell of the Gadsden County Sheriff's Department had McMillian removed from the back of Officer Lawrence's patrol car and photographed. One of the photographs documented some drops of blood on McMillian's face. McMillian was then transferred to the patrol car of Investigator Brian Faison of the Gadsden County Sheriff's Department for transport to the Sheriff's Office. During transport, McMillian heard talk on the police radio about a search for a knife and told Investigator Faison that the knife they were looking for was in the back of the other patrol car. Upon inspection, Investigator Maxwell discovered a long, black-handled knife and a can or bottle opener on the back floorboard of the patrol car. The knife had a broken tip, which was later determined by a fiber and physical match analyst from the Florida Department of Law Enforcement (FDLE) to match a triangular piece of metal found in Mr. Morgan's head.

Also on the scene was Detective Eric Bryant with the State Fire Marshal's Office. He testified that there was only minimal fire damage to the front of the truck with no fire damage to the hood or engine compartment. By this evidence, he excluded as the cause of the fire the truck crashing into the tree. The greatest degree of damage occurred in the rear seats of the truck, and Detective Bryant

- 6 -

concluded that the fire's point of origin was the rear passenger compartment behind the driver's seat. He eliminated accidental causes, such as smoking and electrical or mechanical malfunctions, and opined that under the circumstances, the only cause of the fire was human, not accidental, means. No accelerants were used, and the truck's fire retardant seats led Detective Bryant to conclude that the fire's ignition point was the miscellaneous combustibles on top of the rear seats.

Among the officers at the scene was Deputy Joseph Barnes, a canine handler with the Gadsden County Sheriff's Department. He had his tracking dog take a scent off of Mr. Morgan's body to track anyone who had touched him, and the dog alerted positive for the scent on a fence near I-10. Deputy Barnes was joined by handler teams from Apalachee Correctional Institution, and the officers soon noticed a footprint going across a field near the fence. Eventually, the dogs tracked about a half-mile to a mile away from the crime scene, across the interstate and into another field, where the officers found Mr. Morgan's wallet and some of its contents, including a credit card, strewn about the ground. The officers called someone else to secure the scene and kept tracking for about ten miles along the interstate toward a gas station.

Cannon was next seen at a Shell gas station near the interstate. The gas station attendant testified that a nervous, sweaty man had approached the window[4] on foot and asked her to get him something to drink. He also asked her to leave her shift early to give him a ride. When she refused, Cannon began asking other customers for a ride and was eventually successful in obtaining one. Investigator Maxwell showed up right after Cannon left. The attendant told him what had occurred and showed him the security footage from the store's video camera, depicting the man she had described. Investigator Maxwell recognized Cannon as the man in the video.[5] Two days later, officers received a tip that Cannon was located in a motel off of Pat Thomas Parkway. Officers entered Cannon's motel room and took him into custody. He was wearing the same shirt as that observed on him in the security footage.

Dr. Lisa Flannagan, a forensic pathologist with the Medical Examiner's Office, testified that she conducted the autopsy on Mr. Morgan's body and determined the cause of death to be multiple stab wounds. Mr. Morgan suffered at least thirty major stab wounds and some additional, more superficial injuries. He

---

4. The gas station was closed for the night, so the door was locked and the attendant was assisting customers through a window.

5. Investigator Maxwell testified that Cannon had been "personally familiar" to him for a number of years.

sustained four wounds to his face, one of which passed through the cheek and into the mouth cavity. X-rays of the wounds revealed a small triangular piece of metal embedded in the right side of his forehead, which was later determined to be a piece from the tip of the knife found in the back of the patrol car where McMillian had been sitting.

The most severe and fatal of Mr. Morgan's wounds included a neck wound—which injured the carotid artery and the jugular vein, but would not have been immediately incapacitating—and stabs wounds to the chest and upper back, which injured the pulmonary vein and punctured both lungs, causing them to collapse. There were several defensive wounds on his arms and hands and a curved configuration of small abrasions on the back of his left hand that were consistent with a bite mark or teeth impressions.

The medical examiner testified that Mr. Morgan's wounds could have all been inflicted by the knife with the broken tip. However, she could not rule out another knife having caused some of the injuries. She testified that, based on the extent of the injuries, Mr. Morgan was likely "upright" and "struggling" for a least part of the attack. Lastly, the medical examiner did not believe all of the injuries were sustained while Mr. Morgan was in the truck "because he's, obviously, moving and fighting and the injuries being in so many different locations on both sides of the neck, the left shoulder area, the forearms, his back, and his chest." She

testified that there was no way to determine the sequence in which the wounds were inflicted.

Other testimony established that the murder occurred on a plot of land rented by Cannon's father for farming. There was never any corn found stored on the property. The knife Cannon used to stab Mr. Neel was never conclusively identified. A black, butcher-type knife contained blood for which Mr. Morgan, McMillian and Cannon were excluded as contributors, but the data was insufficient to determine Mr. Neel's possible contribution. Mr. Morgan's blood was found on Cannon's shirt, McMillian's clothing and shoes, and McMillian's face. The mixture of DNA on Mr. Morgan's back pockets excluded Cannon and Mr. Neel as contributors, but included Mr. Morgan and McMillian as possible contributors. The limited DNA evidence from the blood found under Mr. Morgan's fingernails excluded Cannon and Mr. Neel as possible contributors, but did not provide enough information to determine McMillian's possible contribution.

As to Mr. Morgan, the jury found Cannon guilty of first-degree murder—on theories of both premeditation and felony murder—and robbery with a deadly weapon. The jury also convicted Cannon of attempted first-degree premeditated murder and attempted armed robbery as to Mr. Neel and found Cannon guilty of arson for the burning of Mr. Morgan's truck. At the conclusion of the penalty phase, the jury recommended death by a vote of nine to three.

The court conducted a <u>Spencer</u>[6] hearing on November 15, 2012, at which the defense introduced Cannon's school records and a letter from his girlfriend. The defense also presented a licensed psychologist, Dr. Terence Leland, who testified that Cannon's functional abilities amounted to the low average range of intelligence rather than the borderline range because of the very wide disparity between his verbal IQ score of 66 and his nonverbal IQ of 88. Dr. Leland testified that Cannon's overall full-scale IQ score of 77 "is probably a slight underestimate" of his overall abilities. He also diagnosed Cannon with depressive and anxiety disorders, not otherwise specified, because Cannon's symptoms were insufficiently severe to diagnose major depression or generalized anxiety disorder. Also, the parties stipulated that the trial court could consider McMillian's case file and specifically requested that it consider the psychological evaluation reports regarding McMillian's health. The court had adjudicated McMillian "incompetent to proceed because of his mental retardation" on May 17, 2011. Approximately fifteen months later, the court conducted another competency hearing and found that McMillian remained incompetent to stand trial.

The trial court followed the jury's death recommendation, finding that the aggravating factors outweighed the mitigating factors. The court found five

_____

6. <u>Spencer v. State</u>, 615 So. 2d 688 (Fla. 1993).

- 11 -

aggravating circumstances: (1) Cannon was on felony probation at the time of the murder (great weight); (2) Cannon was previously convicted of a violent felony (very great weight); (3) the murder was committed during a robbery/arson/for financial gain (merged) (moderate weight); (4) the murder was especially heinous, atrocious or cruel (HAC) (substantial weight); and (5) the murder was committed in a cold, calculated, and premeditated manner, without any pretense of moral or legal justification (CCP) (great weight).

The trial court rejected all of the statutory mitigating factors as not proven. As nonstatutory mitigating, the trial court found that Cannon demonstrated appropriate courtroom behavior (minimal weight); did not resist arrest (minimal weight); has limited education (very little weight); applied for and obtained farming grants in his youth, despite his educational shortcomings (very little weight); worked hard as a farmer for the family business (very little weight); was a good provider to his family and step-children (very little weight); is a loving person to his siblings and their children (very little weight); has a low IQ (very little weight); came from an emotionally impoverished family background (very little weight); experienced the imprisonment of his siblings during his adolescent, teen, and young adult years (very little weight); experienced "other mental health diagnoses and symptoms" (very little weight); and testified for the State in the case that resulted in his prior violent felony convictions (very little weight).

**ANALYSIS**

Cannon's claims on appeal are as follows: (1) the trial court improperly doubled the aggravators; (2) the trial court erred in applying HAC to Cannon; (3) the court erred in <u>sua sponte</u> modifying the jury instruction on attempted voluntary manslaughter; the State's evidence is insufficient as to Cannon's convictions for (4) robbery, (5) attempted robbery, and (6) arson; (7) the trial court erred in responding to a jury question during deliberations; (8) the court erroneously admitted hearsay statements into evidence; and (9) Cannon's death sentence is disproportionate. These issues are addressed in turn below.

## I. Doubling of Aggravators

As his first issue, Cannon claims that the trial court erred in using the violent nature of his prior felony conviction to support both the weight assigned to the felony probation aggravator and to support applying the prior violent felony aggravator. "A trial court's ruling on an aggravating circumstance is a mixed question of law and fact and will be sustained on review as long as the court applied the right rule of law and its ruling is supported by competent, substantial evidence in the record." <u>Ford v. State</u>, 802 So. 2d 1121, 1133 (Fla. 2001). Cannon does not challenge the sufficiency of the evidence as to the trial court's finding of the felony probation aggravator, only that the violent nature of his prior armed

carjacking conviction was used both in assigning weight to that aggravator and in finding the prior violent felony aggravator, resulting in improper doubling.

"Improper doubling occurs when aggravating factors refer to the same aspect of the crime." Green v. State, 641 So. 2d 391, 395 (Fla. 1994). However, "the facts in a given case may . . . support multiple aggravating factors so long as they are separate and distinct aggravators and not merely restatements of each other." Banks v. State, 700 So. 2d 363, 367 (Fla. 1997). In other words, "where these two aggravating factors are not based on the same essential feature of the crime or of the offender's character, they can be given separate consideration." Agan v. State, 445 So. 2d 326, 328 (Fla. 1983).

In its sentencing order, the trial court noted that Cannon had been convicted of armed carjacking and armed kidnapping and had begun to serve the five-year probationary portion of his sentence on October 4, 2009. Thus, the court found that the instant capital felony, which occurred on December 24, 2010, was committed by a person who was on felony probation at the time of the crime.[7] The trial court found that the felony for which Cannon was on probation was a violent felony and accordingly, assigned the aggravator great weight.

---

7. § 921.141(5)(a), Fla. Stat. (2010).

- 14 -

The trial court also found that the prior violent felony aggravator[8] had been established based on both the prior carjacking episode and the contemporaneous convictions for the attempted murder and attempted robbery of Mr. Neel.  In assigning weight to the aggravator, the court found that this Court established in Bright v. State, 90 So. 3d 249, 260-261 (Fla. 2012), that it is improper to weigh each prior and contemporaneous violent felony separately.  Thus, the trial court stated that it would "consider conviction of a prior felony only as a single aggravating circumstance, assess weight for each form of proof and assign weight only to the more serious form of proof."  The court then outlined the evidence of the convictions and concluded that the carjacking conviction was the weightier, more serious form of proof, so the court assigned the prior violent felony aggravator "very great weight" based on the prior carjacking conviction.

This Court has consistently rejected claims of improper doubling where the prior violent felony aggravator referred to the conviction and the felony probation aggravator "referred to the defendant's status at the time of the murder."  Patrick v. State, 104 So. 3d 1046, 1066 (Fla. 2012); Muhammad v. State, 494 So. 2d 969, 976 (Fla. 1986) ("We have consistently rejected the argument that these two factors improperly double aggravating circumstances."); see also Rose v. State, 787 So. 2d

---

8.  § 921.141(5)(b), Fla. Stat. (2010).

- 15 -

786, 801 (Fla. 2001); Hildwin v. State, 727 So. 2d 193, 196 (Fla. 1998) (rejecting improper doubling argument despite "prior violent felony" and "under sentence of imprisonment" aggravators being based on same offense); Waterhouse v. State, 429 So. 2d 301, 307 (Fla. 1983) (rejecting doubling argument because prior conviction and parole status "were two separate and distinct characteristics of the defendant, not based on the same evidence and the same essential facts"), receded from on other grounds, Owen v. State, 696 So. 2d 715, 720 (Fla. 1997). That is exactly what happened here. Cannon's claim of improper doubling is meritless because the finding of the felony probation aggravator was based on Cannon's status at the time of the murder, while the prior violent felony aggravator was based on the existence of the prior conviction itself.

Cannon is correct that the trial court used the violent nature of his carjacking conviction to assign weight to the felony probation aggravator. This, however, was not error. A finding of violence is not necessary for the finding of the felony probation aggravator. See § 921.141(5)(a), Fla. Stat. (2010). Thus, the violent nature of the carjacking was not used to determine whether the felony probation aggravator had been established, but to determine the weight to be assigned to the aggravator. Furthermore, the weight assigned to aggravating factors is within the trial court's discretion and "is subject to the abuse of discretion standard." Buzia v. State, 926 So. 2d 1203, 1216 (Fla. 2006). Here, Cannon's prior convictions

- 16 -

were violent,[9] and the assignment of great weight to the felony probation

aggravator was not an abuse of discretion. Cannon is not entitled to relief as to this

issue.[10]

## II. HAC Aggravator

Cannon next claims that the trial court erred in applying the HAC aggravator

to his case. The trial court's ruling will be sustained on appeal as long as it is

based on the right rule of law and supported by competent substantial evidence.

Ford, 802 So. 2d at 1133. As found by the trial court in the instant case and

conceded by the parties, there is competent, substantial evidence that the manner in

which Mr. Morgan was murdered qualifies as especially heinous, atrocious, or

---

9. Wright v. State, 19 So. 3d 277, 304 (Fla. 2009) (referring to carjacking and kidnapping as "violent felonies"); Floyd v. State, 913 So. 2d 564, 577 (Fla. 2005) (same).

10. We also address, for the sake of clarity, the trial judge's belief that he was required, under Bright, to determine a separate weight for each underlying felony conviction and then assign weight to the prior violent felony aggravator based only on the more serious of the prior convictions. In Bright, we found error where the trial court "found the prior violent felony aggravating circumstance twice and accorded it great weight twice"—once for the defendant's prior robbery conviction and once based on the contemporaneous murder in that case. 90 So. 3d at 260-61. We explained that "[i]f a defendant has multiple convictions for prior violent felonies, the trial court can find only a single aggravating circumstance, but it may give that circumstance greater weight based upon the existence of multiple convictions." Id. at 261. In other words, multiple convictions may serve as the basis for the prior violent felony aggravator as long as the court only finds the aggravator once and only assigns it one weight—although that one weight may be based on the existence of more than one prior conviction.

cruel. Mr. Morgan sustained at least thirty stab wounds to his head, face, neck, arms, chest, and back. One of his facial wounds indicated that the knife traveled through his cheek and into his mouth cavity. He had several defensive wounds on his hands and arms and a small curve of abrasions on the back of his left hand that was consistent with a bite mark. The medical examiner determined, based on Mr. Morgan's injuries, that Mr. Morgan was alive and likely "upright" and "struggling" during at least part of the attack. His carotid artery and jugular vein were injured, causing him to lose blood and eventually consciousness. The medical examiner testified that this wound would not have been immediately incapacitating and that Mr. Morgan could have lived with this injury for "a couple of minutes."[11]

The trial court found that Cannon's stabbing of Mr. Neel permitted application of the HAC aggravator to Cannon for the stabbing of Mr. Morgan even assuming McMillian alone actually stabbed Mr. Morgan. The court stated that substantial evidence was consistent with McMillian stabbing Mr. Morgan, but also found that none of that evidence established that McMillian stabbed Mr. Morgan and Cannon did not. The court concluded that even though no evidence directly

_____

11. This Court has "repeatedly upheld the HAC aggravating circumstance in cases where the victim has been viciously stabbed numerous times," Perez v. State, 919 So. 2d 347, 379 (Fla. 2005), even "where the medical examiner has determined that the victim was conscious for merely seconds," Francis v. State, 808 So. 2d 110, 135 (Fla. 2001).

indicated that Cannon personally stabbed Mr. Morgan, overwhelming evidence demonstrates that Cannon fully intended the commission of both crimes including the manner of Mr. Morgan's death.

This Court has held that HAC cannot be applied vicariously to a defendant who did not direct the manner of the killing or know the manner in which the murder would occur. See Perez, 919 So. 2d at 380-81; Williams v. State, 622 So. 2d 456, 463 (Fla. 1993); Omelus v. State, 584 So. 2d 563, 566 (Fla. 1991). However, we have also upheld the application of HAC to defendants who were ringleaders or dominant actors in the crime and personally took specific actions that caused the victim's fear, emotional strain, and terror prior to the victim's death. See, e.g., Lugo v. State, 845 So. 2d 74, 112-13 (Fla. 2003) (upholding HAC where the defendant directed the crimes; kidnapped, bound, and gagged the victim; questioned her about assets; and instructed the codefendant to inject her with horse tranquilizers when she resisted); Cave v. State, 727 So. 2d 227, 229 (Fla. 1998) (finding sufficient evidence of HAC where the defendant was the leader of the crime and personally kidnapped the victim at gunpoint, placed her beside him in the backseat, and heard her pleas for her life during the 15-minute car ride to the murder location, after which her removed her from the car and turned her over to his codefendants who then stabbed and shot her); Copeland v. State, 457 So. 2d 1012, 1015 (Fla. 1984) (upholding HAC where the defendant personally

committed the robbery of a convenience store, kidnapped the cashier, and then raped her before she was murdered).

In the instant case, the trial court found that the evidence proved, beyond a reasonable doubt, that Cannon was the sole catalyst and dominant actor in these crimes. Cannon planned the entire incident. He came to the meeting prepared with a means to kill—namely a knife—which he used to initiate the acts of violence by stabbing Mr. Neel. Cannon chose an isolated, overgrown area for the meeting, located on his father's plot of land, and was the sole individual directing the parties to that location. Further, although Mr. Neel understood the purpose of the meeting to be completing a corn transaction, no corn was found at the location, potentially indicating Cannon's alternate purpose for the meeting.

Cannon's dominance is further demonstrated by McMillian's actions after the incident. McMillian wandered to a nearby pond and although panicked and frantic, had remained standing next to the pond until apprehended. McMillian was also cooperative with the police and volunteered information about the knife. Lastly, McMillian has a low IQ, has been intellectually disabled since his youth, has been found incompetent to stand trial, and had no prior involvement with either man—as neither Mr. Neel nor Mr. Morgan knew McMillian until Cannon introduced him. Following the rationale of Lugo, Cave II, and Copeland, we find

no error in applying HAC to Cannon because he personally orchestrated the method of the heinous murder and initiated the plan for the crime.

### III. Jury Instruction on Attempted Voluntary Manslaughter

Cannon argues the trial court erred in instructing the jury on attempted voluntary manslaughter in two ways: (1) by, sua sponte, modifying the standard jury instruction in an attempt to correct a Montgomery[12] error, and (2) by failing to include, in this modification, a reinstruction on justifiable or excusable homicide. The State concedes that the trial court erred in its reinstruction of the jury.[13] However, "[j]ury instructions are subject to the contemporaneous objection rule and, absent an objection at trial, can be raised on appeal only if fundamental error occurred." Montgomery, 39 So. 3d at 258 (internal quotation marks omitted). In this case, Cannon did not object to the trial court's erroneous instruction and concedes that the error is not fundamental because attempted voluntary

---

12. State v. Montgomery, 39 So. 3d 252 (Fla. 2010).

13. See Williams v. State, 123 So. 3d 23, 24 (Fla. 2013) (finding it fundamental error to give standard jury instruction on attempted manslaughter by act, which requires jury to find that defendant committed act intended to cause death, where defendant is convicted of offense not more than one step removed from attempted manslaughter); Pena v. State, 901 So. 2d 781, 787-88 (Fla. 2005) (finding error for trial court to omit instruction on excusable or justifiable homicide, but such error not fundamental where offense of which defendant was convicted is two or more steps removed from offense for which jury was improperly instructed).

- 21 -

manslaughter is two steps removed from attempted first-degree murder. As such, Cannon's claim is procedurally barred, and he is not entitled to relief.

Cannon nonetheless cites to <u>Williams v. State</u>, 395 So. 2d 1236 (Fla. 4th DCA 1981), and <u>Hudson v. State</u>, 368 So. 2d 437 (Fla. 3rd DCA 1979), to argue that his claim was not waived by his failure to object because he was not provided with an opportunity to object outside the presence of the jury under Florida Rule of Criminal Procedure 3.390(d). However, our review of the record demonstrates that nothing prevented Cannon from objecting to the trial court's modification and requesting a sidebar conference outside of the jury's presence. Under Cannon's interpretation, a defendant could intentionally fail to object to a court's instruction of the jury and avoid the procedural bar on appeal by arguing that the trial court did not provide an opportunity to object. Such gamesmanship defeats the purpose of Rule 3.390(d), which is to put the trial court on notice of potential errors in charging the jury.

### IV. Trial Court's Response to Jury Question

After the jury retired to deliberate, it submitted the following written question to the trial court:

> As to count 4, attempted robbery with a deadly weapon, we're not clear as to what the law states. Can we assume or do we have to cite specific evidence. By assume, we mean because he took Morgan's wallet, but no clear attempt was made to take Neel's wallet, et cetera, prior payments of corn, which I'm not sure –

After reading the question and inquiring of the State and the defense, the trial court decided on the following answer: "It makes more sense just to say you're not required to cite evidence. You are required only to complete the verdict form. Your responsibility is to determine if the evidence proves each element [beyond a reasonable doubt]." The record demonstrates that defense counsel objected to the trial court's answer.

Generally, the feasibility and scope of any reinstruction of the jury "resides within the discretion of the [trial] judge." Garcia v. State, 492 So. 2d 360, 366 (Fla. 1986). Discretion is only abused "when the judicial action is arbitrary, fanciful, or unreasonable, which is another way of saying that discretion is abused only where no reasonable person would take the view adopted by the trial court." Armstrong v. State, 73 So. 3d 155, 173 (Fla. 2011) (quoting White v. State, 817 So. 2d 799, 806 (Fla. 2002)). Nevertheless, the jury instructions must not be confusing, contradictory, or misleading. Id.

The defense argued that the court should have given the "single defendant, multiple counts" instruction again, which reads:

> A separate crime is charged in each [count of the information] [indictment] [information] and, although they have been tried together, each crime and the evidence applicable to it must be considered separately and a separate verdict returned as to each. A finding of guilty or not guilty as to one crime must not affect your verdict as to the other crime(s) charged.

Fla. Std. Jury Instr. (Crim.) 3.12(a). Although including this sentence might have helped the trial judge to address the defense's interpretation of what the jury was asking, the instruction given by the judge was a correct and complete statement of the law and was not confusing, contradictory or misleading. The judge's answer and interpretation of the jury's question was not such that no reasonable person would adopt his view, thus we find no abuse of discretion in answering the jury's question.

Although there was no abuse of discretion here, we caution that the better practice when faced with a confusing or ambiguous question from the jury would be to inquire of the jury as to the meaning of its question. Such a procedure would allow the court to provide the most accurate and complete response possible. See Slinsky v. State, 232 So. 2d 451, 453-54 (Fla. 4th DCA 1970) (suggesting that trial court, when faced with a jury request during deliberations, "should have advised counsel of it and re-convened court with defendant in attendance. Depending upon the nature and scope of the jury's question, the court could then recall or offer to recall the jury into the courtroom for inquiry and the rendition of a response to their request"). This method would seem especially appropriate in cases like this one where the jury question itself was an incomplete sentence, subject to differing interpretations.

## V. Hearsay Statements/Confrontation Clause

Cannon asserts that a significant portion of Mr. Neel's testimony is inadmissible hearsay and that the trial court erred in permitting its introduction into evidence. Cannon also alleges, in one sentence of his initial brief, that this testimony violated his right of confrontation under Crawford v. Washington, 541 U.S. 36 (2004). Each of Cannon's claims will be addressed separately below.

A trial court's decision to admit evidence is reviewed for an abuse of discretion. Johnston v. State, 863 So. 2d 271, 278 (Fla. 2003). However, the question of whether a statement is hearsay is a matter of law and is subject to de novo review on appeal. Burkey v. State, 922 So. 2d 1033, 1035 (Fla. 4th DCA 2006). Hearsay is "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." § 90.801(1)(c), Fla. Stat. (2010). Rather than indicating the specific statements to which he objects, Cannon has provided us with only a general summary of Mr. Neel's testimony. We thus deny most of this claim as insufficiently pled. See, e.g., Wyatt v. State, 78 So. 3d 512, 521 & n.6 (Fla. 2011) (denying claims as insufficiently pled because, in challenging gruesome photos, counsel failed to specifically address which photos he was challenging and in challenging the jury instructions, counsel failed to discuss which specific instructions were allegedly erroneous or what specific challenges trial counsel should have raised); Ferrell v. State, 29 So. 3d 959, 976 (Fla. 2010) (denying

challenge that counsel erroneously waived the defendant's presence at all pretrial proceedings as insufficiently pled where defendant failed to identify any critical stage of his trial from which he was involuntarily absent). Because we have identified three statements during Mr. Neel's trial testimony to which Cannon objected, we choose to address that portion of his claim. The three statements are (1) Mr. Morgan telling Mr. Neel that Cannon had corn to sell, (2) Mr. Morgan prepaying for a second purchase of corn from Cannon,[14] and (3) Mr. Morgan telling Mr. Neel about Mr. Morgan's "aggravation" in dealing with Cannon. Cannon is only entitled to relief if the admission of these statements was erroneous and not harmless.

Harmless error is error for which "there is no reasonable possibility that the error contributed to the conviction." State v. DiGuilio, 491 So. 2d 1129, 1135 (Fla. 1986). Cannon is not entitled to relief as to any of these statements because their admission into evidence was harmless. Even without these three details, the jury still heard that Mr. Morgan and Mr. Neel met Cannon at a gas station and that Mr. Neel understood the purpose of this meeting to be completing a purchase of corn. Further, Cannon was identified as the seller by Mr. Neel's properly admitted testimony, which demonstrated that Cannon was the guiding force behind this

_____

14. We note that Cannon objected to this statement not as hearsay, but on the grounds of a lack of foundation or personal knowledge.

transaction. Upon meeting at the gas station, Cannon had to convince Mr. Morgan to let McMillian, Cannon's codefendant, ride with them; Cannon directed Mr. Morgan to drive to a remote, wooded area; and Cannon not only brought a knife with him on this ride, but also used that knife to initiate the attack by stabbing Mr. Neel in the neck. Therefore, there is no reasonable possibility that the admission of these three statements contributed to the conviction.

Cannon also argues that the admission of Mr. Neel's testimony violates his right of confrontation because the statements were testimonial under Crawford. However, the statements at issue here are not testimonial in nature. They were not "made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial." Franklin v. State, 965 So. 2d 79, 90 (Fla. 2007) (internal quotation marks omitted). They are simply nontestimonial statements to a friend about trivial daily matters, not involving any potential criminal proceeding. Cf. id. at 91 (citing cases and holding that victim's spontaneous statements to friend after being shot were not testimonial). Accordingly, Cannon is not entitled to relief.

## VI. Sufficiency of the Evidence

Cannon next claims that there is insufficient evidence to convict him of robbery, attempted robbery, and arson. Whether a defendant contests the sufficiency of the evidence against him or not, this Court has a mandatory

obligation to independently determine whether there was sufficient evidence to sustain the jury's verdict.  See Kalisz v. State, 124 So. 3d 185, 214 (Fla. 2013), cert. denied, 134 S. Ct. 1547 (2014); Wheeler v. State, 4 So. 3d 599, 605 (Fla. 2009).  "Whether the evidence is sufficient is judged by whether it is competent and substantial."  Phillips v. State, 39 So. 3d 296, 308 (Fla. 2010).  However, if the State's evidence of guilt is wholly circumstantial, "not only must the evidence be sufficient to establish each element of the offense," but it must also be "inconsistent with any reasonable hypothesis of innocence proposed by the defendant."  Twilegar v. State, 42 So. 3d 177, 188 (Fla. 2010).  Our duty on appeal is "to review the record in the light most favorable to the prevailing theory and to sustain that theory if it is supported by competent substantial evidence."  Orme v. State, 677 So. 2d 258, 262 (Fla. 1996).

Cannon argues that the State's evidence was insufficient to sustain his conviction for the robbery of Mr. Morgan.  At trial, defense counsel moved for a judgment of acquittal as to this count based on a lack of evidence.  The trial court denied the motion.

> "Robbery" means the taking of money or other property which may be the subject of larceny from the person or custody of another, with intent to either permanently or temporarily deprive the person or the owner of the money or other property, when in the course of the taking there is the use of force, violence, assault, or putting in fear.

§ 812.13(1), Fla. Stat. (2010). The standard jury instruction also includes the requirement that the stolen property be "of some value." Fla. Std. Jury Instr. (Crim.) 15.1; see Holliday v. State, 781 So. 2d 496, 498 (Fla. 5th DCA 2001). However, the State is not required to prove an exact value for the property taken. See McKinney v. State, 66 So. 3d 852, 857 (Fla. 2011) (finding that the offense of "grand theft" has an element that "robbery" does not—the requirement that the State show the value of the property taken). Even if Mr. Morgan's wallet, which was found on the path Cannon took to flee the scene of the stabbing, contained no money, it still has inherent value. See, e.g., Monlyn v. State, 894 So. 2d 832, 836 (Fla. 2004) (finding crime of robbery established by defendant's taking of victim's wallet, even if no cash was actually found therein); Woodel v. State, 804 So. 2d 316, 319, 322 (Fla. 2001) (upholding robbery conviction for theft of victim's wallet containing victim's identification and credit cards).

Because the State's evidence of armed robbery was wholly circumstantial,[15] the State was required to introduce evidence sufficient to rebut any reasonable

---

15. There was no witness testimony regarding the events that transpired after Mr. Neel's escape from the truck, which is when the robbery occurred. See Twilegar, 42 So. 3d at 188-89 ("Direct evidence is that to which the witness testifies of his own knowledge as to the facts at issue. Circumstantial evidence is proof of certain facts and circumstances from which the trier of fact may infer that the ultimate facts in dispute existed or did not exist." (quoting Davis v. State, 90 So. 2d 629, 631 (Fla. 1956))). Also, Mr. Morgan's wallet was found not in Cannon's possession, but scattered along Cannon's escape route.

hypothesis of innocence proposed by Cannon. See Twilegar, 42 So. 3d at 188.

Here, Cannon has not proposed any reasonable hypothesis of innocence. The

murder occurred in a remote area, and there was not a great deal of time that

passed between the murder, police officers' response to the scene, and McMillian's

apprehension. Soon thereafter, the police, with canine units, began to track the

route Cannon took to leave the scene, and during that tracking they recovered the

victim's wallet and some of its contents. It is not reasonable to propose, for

example, that another individual happened upon Mr. Morgan's body, took his

wallet, and traveled along Cannon's exact escape route, discarding the wallet and

its contents along the way. No reasonable hypothesis of innocence exists as to the

robbery of Mr. Morgan. See, e.g., Ferguson v. State, 417 So. 2d 631 (Fla. 1982)

(rejecting, as unreasonable, defendant's hypothesis that because victim's bodies

were left overnight in a wooded area, a passerby could have taken their money and

jewelry), superseded by statute on other grounds, ch. 96-290, § 5, ch. 96-302, § 1,

Laws of Fla., as recognized in Merck v. State, 763 So. 2d 295 (Fla. 2000). The

robbery conviction is supported by competent, substantial evidence, and Cannon is

not entitled to relief.[16]

---

16. We also affirm the conviction for arson as it is supported by competent, substantial evidence, but vacate the attempted robbery conviction based on insufficient evidence. As to arson, Detective Bryant testified that the fire was caused by human, not accidental, means and originated in the rear passenger compartment behind the driver's seat. Cannon and McMillian were seated in that

Cannon was convicted for the first-degree murder of Mr. Morgan on theories of both premeditation and felony murder. He was also convicted of attempted first-degree premeditated murder as to Mr. Neel. The evidence of felony murder consists of three underlying felonies: the attempted murder of Mr. Neel, the robbery of Mr. Morgan, and arson. Any one is sufficient on its own to form the basis for Cannon's conviction for felony murder.

A jury can infer premeditation from circumstantial evidence such as " 'the nature of the weapon used, the presence or absence of adequate provocation, previous difficulties between the parties, the manner in which the homicide was committed, and the nature and manner of the wounds inflicted.' " Bradley v. State, 787 So. 2d 732, 738 (Fla. 2001) (quoting Norton v. State, 709 So. 2d 87, 92 (Fla. 1997)). Premeditation is "a fully formed conscious purpose to kill" and "may be formed a moment before the act," as long as it exists long enough for the defendant to understand the nature of the act and its probable result. Woods v. State, 733 So. 2d 980, 985 (Fla. 1999); Buckner v. State, 714 So. 2d 384, 387 (Fla. 1998).

Here, Cannon brought a knife with him and used that knife to stab Mr. Neel. Cannon's stabbing of Mr. Neel was not provoked in any way, nor does the record

---

area of the truck. This is sufficient evidence to support Cannon's arson conviction. As to attempted robbery, there was no evidence of any desire to rob Mr. Neel. We vacate that conviction because stabbing Mr. Neel in the neck, without more, is not competent, substantial evidence of attempted robbery.

demonstrate any provocation for the brutal attack on Mr. Morgan. Mr. Neel's injuries were the result of a surprise attack initiated while the other unwitting victim, Mr. Morgan, was driving and unable to defend his friend. Mr. Morgan's extensive and incapacitating injuries support the jury's finding of premeditation. As to the manner in which the homicide was committed, the medical examiner testified that Mr. Morgan suffered at least thirty stab wounds, all while struggling and fighting and even possibly driving during some of the attack. As additional support for the finding of premeditation, Cannon chose a remote, wooded area as the group's destination, and despite Mr. Neel's understanding of the purpose of the trip, no corn was found at this location, indicating Cannon's possible alternative purpose for directing the drive to that area. We conclude that Cannon's convictions for first-degree and attempted first-degree murder are supported by competent, substantial evidence.

Cannon's hypothesis of innocence as to first-degree murder is that McMillian killed Mr. Morgan.[17] However, Cannon can be held responsible for first-degree murder either directly or as principal. "[I]n order to be convicted as principal for a crime physically committed by someone else, a defendant must both intend that the crime be committed and do some act to assist the other person in

_____

17. Cannon does not set forth a hypothesis of innocence as to the attempted first-degree murder.

actually committing the crime." Brown v. Crosby, 249 F. Supp. 2d 1285, 1318 (S.D. Fla. 2003). In this instance, Cannon's conscious intent is demonstrated by his choice of a remote location; the fact that no corn was found at that location, thereby exposing Cannon's possible deception in directing Mr. Morgan to that area; and the fact that Cannon brought and used a knife during the events. In addition, Cannon's act of stabbing Mr. Neel clearly began the acts of violence. Lastly, the trial court found that Cannon was the dominant actor and sole catalyst of the crimes. We agree and find that competent, substantial evidence exists to support Cannon's convictions of first-degree and attempted first-degree murder. Orme, 677 So. 2d at 262 (upholding trial court's conclusion that evidence supported State's theory because although evidence was conflicting, under circumstantial evidence standard of review, trial court's conclusion was supported by competent substantial evidence).

## VII. Proportionality

Proportionality review is not a quantitative analysis, counting the number of aggravators and mitigators, but a qualitative review of the underlying basis for each aggravating and mitigating factor and of the totality of the circumstances, comparing the case to other capital cases with similar mitigating and aggravating circumstances. See Gregory v. State, 118 So. 3d 770, 785-86 (Fla. 2013). Cannon argues that McMillian's intellectual disability may make McMillian ineligible for

the death penalty and that McMillian's resulting disparate sentence makes Cannon's death sentence disproportionate. The parties stipulated that the issue of McMillian's eligibility for the death penalty because of his intellectual disability was <u>unresolved</u> at the time of trial. However, such determination is not necessary here because Cannon was the more culpable defendant.

Disparate treatment of a codefendant who is equally as culpable as or more culpable than the defendant can render the defendant's sentence disproportionate. <u>Henyard v. State</u>, 689 So. 2d 239, 254 (Fla. 1996). However, disparate treatment is justified when the defendant is the more culpable actor in the crime. <u>Larzelere v. State</u>, 676 So. 2d 394, 407 (Fla. 1996); <u>Hannon v. State</u>, 638 So. 2d 39, 44 (Fla. 1994) (finding death sentence proportionate where less culpable codefendants received less severe punishment). As outlined above, Cannon was the driving force and dominant actor in this case. McMillian, who seemed stunned by the course of events, is not equally culpable. Therefore, disparate treatment would be justified. We find that death is a proportionate sentence here. <u>See, e.g.</u>, <u>Farina v. State</u>, 801 So. 2d 44, 48, 56 (Fla. 2001); <u>Simpson v. State</u>, 3 So. 3d 1135, 1148-49 (Fla. 2009).

## CONCLUSION

Based on the foregoing, we affirm Cannon's convictions and sentences for first-degree murder, attempted first-degree murder, robbery, and arson.

It is so ordered.

LABARGA, C.J., and PARIENTE, LEWIS, QUINCE, POLSTON, and PERRY, JJ., concur.
CANADY, J., concurs in part and dissents in part with an opinion.

NOT FINAL UNTIL TIME EXPIRES TO FILE REHEARING MOTION, AND IF FILED, DETERMINED.

CANADY, J., concurring in part and dissenting in part.

I concur in the affirmance of the first-degree murder, attempted first-degree murder, robbery and arson convictions, and of the sentence of death. I dissent, however, from the reversal of the attempted robbery conviction. I would affirm that conviction.

An Appeal from the Circuit Court in and for Gadsden County,
    Johnathan Eric Sjostrom, Judge - Case No. 202010CF000663BXXXMX

Baya Harrison, III, Monticello, Florida,

    for Appellant

Pamela Jo Bondi, Attorney General, Charmaine Millsaps, Assistant Attorney General, and Patrick M. Delaney, Assistant Attorney General, Tallahassee, Florida,

    for Appellee