# Supreme Court of Florida

_____

No. SC16-2089
_____

**GREGORY PRESLEY,**
Petitioner,

vs.

**STATE OF FLORIDA,**
Respondent.

[September 20, 2017]

LABARGA, C.J.

This case is before the Court for review of the decision of the First District Court of Appeal in Presley v. State, 204 So. 3d 84 (Fla. 1st DCA 2016). The district court certified that its decision is in direct conflict with the decision of the Fourth District Court of Appeal in Wilson v. State (Wilson v. State), 734 So. 2d 1107 (Fla. 4th DCA 1999). We have jurisdiction. See art. V, § 3(b)(4), Fla. Const. For the reasons expressed below, we approve the decision of the First District and hold that law enforcement officers may, as a matter of course, detain the

passengers of a vehicle for the reasonable duration of a traffic stop without violating the Fourth Amendment.[1]

## FACTS AND PROCEDURAL BACKGROUND

At the time of the events in this case, Gregory Presley was on drug offender probation. A special condition of the probation provided, "You will abstain entirely from the use of alcohol and/or illegal drugs, and you will not associate with anyone who is illegally using drugs or consuming alcohol."

During the early morning hours of January 29, 2015, Gainesville police officer Tarik Jallad conducted a traffic stop of a vehicle for a faulty taillight and a stop sign violation. Presley was one of two passengers in the vehicle. Officers John Pandak and Joshua Meurer subsequently responded to the scene based upon a request for backup due to a struggle occurring with the other passenger, who had exited the vehicle and attempted to leave. At the time of their arrival, Officer Jallad and a second officer were dealing with that passenger, who was in handcuffs and behaving belligerently. Presley and the driver were standing outside of the vehicle. Officer Pandak approached Presley and asked for his name and identification, both of which Presley provided. Presley volunteered his date of

---

1. In reaching this holding, we expressly decline to address whether law enforcement may detain passengers during a traffic stop of a common carrier or a vehicle that, at the time of the stop, is being utilized as part of a transportation-based business.

birth. Officer Pandak asked general questions, and Presley stated that the group had been at his aunt's house. During the interaction, Presley admitted he had been consuming alcohol.[2] When Presley asked, "So what is the problem?" Officer Pandak responded, "I don't know, man. This is a traffic stop, you're part of it. So we're hanging out. That's all there is to it." Officer Pandak later stated, "Well, we're just talking, man. You can't go anywhere at the moment because you're part of this stop. That's all." After a background check revealed Presley was on drug offender probation with the special condition that he not consume alcohol, Presley was arrested for the violation of probation. During the search incident to arrest, Officer Pandak recovered a plastic bag containing powder cocaine from Presley's pocket.

Presley filed a motion to suppress his statements and all evidence seized on the basis that he was illegally detained during the traffic stop. The circuit court denied the motion, concluding that although Presley was detained, the limited nature and duration of the detention did not significantly interfere with his Fourth Amendment liberty interests. The circuit court revoked Presley's probation and sentenced him to multiple terms of incarceration for his earlier drug crimes.

---

2. Officer Meurer could smell alcohol on Presley, and he heard Presley say he had been "drinking all day."

The First District Court of Appeal affirmed, holding that "an officer may, as a matter of course, detain a passenger during a lawful traffic stop without violating the passenger's Fourth Amendment rights." Presley, 204 So. 3d at 85-86. The district court fully concurred with the unanimous en banc decision of the Fifth District Court of Appeal in Aguiar v. State, 199 So. 3d 920 (Fla. 5th DCA 2016). Presley, 204 So. 3d at 89.

The First District recognized that in Pennsylvania v. Mimms, 434 U.S. 106 (1977), and Maryland v. Wilson (Maryland v. Wilson), 519 U.S. 408 (1997), the United States Supreme Court held that both drivers and passengers can be asked to exit the vehicle during a traffic stop. Presley, 204 So. 3d at 87. The First District then explained that the seminal case in Florida on passenger detentions during traffic stops is Wilson v. State, the case with which conflict was certified. Presley, 204 So. 3d at 88-89. In Wilson v. State, the Fourth District Court of Appeal held:

> [A] police officer conducting a lawful traffic stop may not, as a matter of course, order a passenger who has left the stopped vehicle to return to and remain in the vehicle until completion of the stop. The officer must have an articulable founded suspicion of criminal activity or a reasonable belief that the passenger poses a threat to the safety of the officer, himself, or others before ordering the passenger to return to and remain in the vehicle.

734 So. 2d at 1113. The Fourth District determined that:

> [A] command preventing an innocent passenger from leaving the scene of a traffic stop to continue on his independent way is a greater intrusion upon personal liberty than an order simply directing a passenger out of the vehicle. Such an arbitrary interference with the

- 4 -

freedom of movement of one who is not suspected of any illegal activity whatsoever cannot be classified as a <u>de minimis</u> intrusion.

<u>Id.</u> at 1111-12.

The First District noted that the <u>Aguiar</u> court concluded the analysis in <u>Wilson v. State</u> was flawed because it failed to give sufficient deference to officer safety. <u>Presley</u>, 204 So. 3d at 88 (citing <u>Aguiar</u>, 199 So. 3d at 923). The Fifth District in <u>Aguiar</u> posited that, while allowing a passenger to remain in the vehicle during a stop posed a danger to officers in that the passenger might have access to weapons, allowing a passenger to leave the scene could also present a dangerous situation. 199 So. 3d at 925. For example, the passenger might return to attack the officer while the officer is focused on the driver. <u>Id.</u> The Fifth District further noted, "[a] departing passenger is a distraction that divides the officer's focus and thereby increases the risk of harm to the officer." <u>Id.</u> The First District acknowledged the <u>Aguiar</u> court's disagreement with the Fourth District's conclusion that detaining the passenger for the duration of the stop was not a <u>de minimis</u> intrusion:

> [E]ven if detaining a passenger who desires to leave is more burdensome than directing a stopped passenger to step out of the vehicle, the infringement is minimal in light of the fact that: (1) the passenger's planned mode of travel has already been lawfully interrupted; (2) the passenger has already been "stopped" due to the driver's lawful detention; and (3) routine traffic stops are brief in duration. . . . Because the legitimate and weighty concern of officer safety can only be addressed "<u>if the officers routinely exercise unquestioned command of the situation</u>[,]" we believe that this

- 5 -

interest outweighs the minimal intrusion on those few passengers who might prefer to leave the scene.

Presley, 204 So. 3d at 88 (quoting Aguiar, 199 So. 3d at 925-26 (quoting Maryland v. Wilson, 519 U.S. at 414)).

Additionally, the Aguiar court determined that two Supreme Court cases—Brendlin v. California, 551 U.S. 249 (2007), and Arizona v. Johnson, 555 U.S. 323 (2009)—support the conclusion that a passenger may be detained for the duration of a traffic stop. See Presley, 204 So. 3d at 88-89 (citing Aguiar, 199 So. 3d at 927-30). The First District noted that in both cases, the Supreme Court held a traffic stop seizes both the driver and any passengers. Presley, 204 So. 3d at 88-89 (citing Brendlin, 551 U.S. at 251; Johnson, 555 U.S. at 327). The Supreme Court in Johnson further concluded that "[a]n officer's inquiries into matters unrelated to the justification for the traffic stop . . . do not convert the encounter into something other than a lawful seizure, so long as those inquiries do not measurably extend the stop's duration." See Presley, 204 So. 3d at 89 (quoting Johnson, 555 U.S. at 333). Noting that the Aguiar court relied upon Brendlin and Johnson to hold an officer may, as a matter of course, detain a passenger during a lawful stop without violating the Fourth Amendment, the First District agreed with this conclusion and certified conflict with Wilson v. State, as well as "its progeny." Presley, 204 So. 3d at 89.

This review follows.

# ANALYSIS

## Standards of Review

The Fourth Amendment to the United States Constitution and section 12 of Florida's Declaration of Rights both guarantee citizens the right to be free from unreasonable searches and seizures. The search and seizure provision of the Florida Constitution contains a conformity clause providing that the right

> shall be construed in conformity with the 4th Amendment to the United States Constitution, as interpreted by the United States Supreme Court. Articles or information obtained in violation of this right shall not be admissible in evidence if such articles or information would be inadmissible under decisions of the United States Supreme Court construing the 4th Amendment to the United States Constitution.

Art. I, § 12, Fla. Const.; see also State v. Butler, 655 So. 2d 1123, 1125 (Fla. 1995) ("This Court is bound, on search and seizure issues, to follow the opinions of the United States Supreme Court regardless of whether the claim of an illegal arrest or search is predicated upon the provisions of the Florida or United States Constitutions.").

The holdings in Presley and Wilson v. State reach opposite conclusions on a legal issue—whether law enforcement officers may, during a lawful traffic stop, detain a passenger as a matter of course for the duration of the stop without violating the passenger's Fourth Amendment rights. Because this is a pure question of law, the standard of review is de novo. Twilegar v. State, 42 So. 3d

177, 192 (Fla. 2010). However, to the extent any factual findings are involved in the application of the law to a specific case, the findings of the circuit court "must be sustained if supported by competent substantial evidence." Id.

As noted by the United States Supreme Court, "[t]he touchstone of [an] analysis under the Fourth Amendment is always 'the reasonableness in all the circumstances of the particular governmental invasion of a citizen's personal security.' " Mimms, 434 U.S. at 108-09 (quoting Terry v. Ohio, 392 U.S. 1, 19 (1968)). "Reasonableness . . . depends 'on a balance between the public interest and the individual's right to personal security free from arbitrary interference by law officers.' " Mimms, 434 U.S. at 109 (quoting United States v. Brignoni-Ponce, 422 U.S. 873, 878 (1975)).

**Supreme Court Precedent**

Because the Presley and Aguiar courts concluded that the evolution of United States Supreme Court precedent with regard to traffic stops and passengers necessitated a reconsideration of Wilson v. State—a conclusion the State contends is also supported by the Supreme Court's decision in Rodriguez v. United States, 135 S. Ct. 1609 (2015)—a review of those cases follows.

In Mimms, the Supreme Court held that law enforcement officers during a traffic stop could ask the driver to exit the vehicle without violating the Fourth

Amendment. 434 U.S. at 108-09. Weighing the competing interests, the Court

first stated:

> We think it too plain for argument that the State's proffered
> justification—the safety of the officer—is both legitimate and
> weighty. "Certainly it would be unreasonable to require that police
> officers take unnecessary risks in the performance of their duties."
> Terry v. Ohio, [] 392 U.S. at 23. And we have specifically recognized
> the inordinate risk confronting an officer as he approaches a person
> seated in an automobile. "According to one study, approximately
> 30% of police shootings occurred when a police officer approached a
> suspect seated in an automobile. Bristow, Police Officer Shootings—
> A Tactical Evaluation, 54 J. Crim. L. C. & P.S. 93 (1963)." Adams v.
> Williams, 407 U.S. 143, 148 n.3 (1972). We are aware that not all
> these assaults occur when issuing traffic summons, but we have
> before expressly declined to accept the argument that traffic violations
> necessarily involve less danger to officers than other types of
> confrontations. United States v. Robinson, 414 U.S. 218, 234 (1973).
> Indeed, it appears "that a significant percentage of murders of police
> officers occurs when the officers are making traffic stops." Id. at 234
> n.5.

Id. at 110.[3] The Supreme Court then concluded that the intrusion upon the liberty

interest of the driver was de minimis:

> The driver is being asked to expose to view very little more of his
> person than is already exposed. The police have already lawfully
> decided that the driver shall be briefly detained; the only question is
> whether he shall spend that period sitting in the driver's seat of his car
> or standing alongside it. Not only is the insistence of the police on the
> latter choice not a "serious intrusion upon the sanctity of the person,"

---

3. The Supreme Court also noted "[t]he hazard of accidental injury from
passing traffic to an officer standing on the driver's side of the vehicle may also be
appreciable in some situations." Id. at 111. Therefore, an officer "prudently may
prefer to ask the driver to step out of the car and off onto the shoulder of the road
where the inquiry may be pursued with greater safety to both." Id.

but it hardly rises to the level of a " 'petty indignity.' " Terry v. Ohio, 392 U.S. at 17. What is at most a mere inconvenience cannot prevail when balanced against legitimate concerns for the officer's safety.

Id. at 111.

In Maryland v. Wilson, the Supreme Court applied the holding in Mimms to passengers in vehicles that are lawfully stopped. 519 U.S. at 410. The Court noted the same interest in officer safety is present regardless of whether the vehicle occupant is a driver or passenger:

> Regrettably, traffic stops may be dangerous encounters. In 1994 alone, there were 5,762 officer assaults and 11 officers killed during traffic pursuits and stops. Federal Bureau of Investigation, Uniform Crime Reports: Law Enforcement Officers Killed and Assaulted 71, 33 (1994). In the case of passengers, the danger of the officer's standing in the path of oncoming traffic would not be present except in the case of a passenger in the left rear seat, but the fact that there is more than one occupant of the vehicle increases the possible sources of harm to the officer.

Id. at 413. The Supreme Court concluded the personal liberty interest of the passenger is greater than that of the driver because, while there is probable cause to believe the driver has committed a vehicular offense, "there is no such reason to stop or detain the passengers." Id. However, the Court determined that the additional intrusion in asking a passenger to exit the vehicle was minimal:

> [A]s a practical matter, the passengers are already stopped by virtue of the stop of the vehicle. The only change in their circumstances which will result from ordering them out of the car is that they will be outside of, rather than inside of, the stopped car. Outside the car, the passengers will be denied access to any possible weapon that might be concealed in the interior of the passenger compartment. It would

- 10 -

seem that the possibility of a violent encounter stems not from the ordinary reaction of a motorist stopped for a speeding violation, but from the fact that evidence of a more serious crime might be uncovered during the stop. And the motivation of a passenger to employ violence to prevent apprehension of such a crime is every bit as great as that of the driver.

Id. at 413-14. The Supreme Court quoted Michigan v. Summers, 452 U.S. 692 (1981), in support of its conclusion that the Fourth Amendment permits law enforcement officers to order passengers out of a vehicle:

> [In Summers,] the police had obtained a search warrant for contraband thought to be located in a residence, but when they arrived to execute the warrant they found Summers coming down the front steps. The question in the case depended "upon a determination whether the officers had the authority to require him to re-enter the house and to remain there while they conducted their search." Id. at 695. In holding as it did, the Court said:
>
>> Although no special danger to the police is suggested by the evidence in this record, the execution of a warrant to search for narcotics is the kind of transaction that may give rise to sudden violence or frantic efforts to conceal or destroy evidence. The risk of harm to both the police and the occupants is minimized if the officers routinely exercise unquestioned command of the situation.

Maryland v. Wilson, 519 U.S. at 414 (quoting Summers, 452 U.S. at 702-03).

The Supreme Court rejected Wilson's contention that, because the Court generally eschews bright-line rules in the Fourth Amendment context, it should not adopt a bright-line rule with regard to passengers during lawful traffic stops: "[T]hat we typically avoid per se rules concerning searches and seizures does not mean that we have always done so; Mimms itself drew a bright line, and we

- 11 -

believe the principles that underlay that decision apply to passengers as well." Id. at 413 n.1. The Supreme Court also declined to address the State of Maryland's assertion that the Court should hold an officer may forcibly detain a passenger for the duration of a stop. Id. at 415 n.3. The Supreme Court concluded that Wilson was not subjected to detention based upon the stop of the vehicle once he exited it at the officer's request. Id. Instead, when Wilson exited the vehicle, crack cocaine fell to the ground. Id. at 411. Therefore, Wilson was arrested based on probable cause to believe he was guilty of possession of cocaine with intent to distribute. Id. at 415 n.3. As a result, the Supreme Court stated, "The question which Maryland wishes answered . . . is not presented by this case, and we express no opinion upon it." Id. Thus, Maryland v. Wilson did not resolve the issue presented by this case—the detention of a passenger as a matter of course during a traffic stop.

In Brendlin, a unanimous Supreme Court held that a traffic stop seizes both driver and passengers for Fourth Amendment purposes, such that a passenger may challenge the constitutionality of the stop. 551 U.S. at 251. In that case, two officers stopped a vehicle to verify that a temporary permit affixed to the vehicle was actually assigned to the vehicle. Id. at 252.[4] One officer recognized the passenger as "one of the Brendlin brothers," and knew that one of the brothers had

---

4. The State of California conceded the police did not have reasonable suspicion to justify a traffic stop on this basis. Id. at 253 n.2.

"dropped out of parole supervision." Id. The officer verified that Brendlin was a parole violator with an outstanding no-bail arrest warrant and ordered Brendlin out of the vehicle. Id. During the search incident to arrest, the officers found a syringe cap on his person, and a search of the vehicle revealed tubing, a scale, and "other things used to produce methamphetamine." Id. Brendlin was charged with possession and manufacture of methamphetamine. Id. at 253. He moved to suppress the evidence, contending the traffic stop constituted an unlawful seizure of his person. Id.

In concluding that passengers are seized during a traffic stop for Fourth Amendment purposes, the Supreme Court first noted the general proposition that:

> [a] person is seized by the police and thus entitled to challenge the government's action under the Fourth Amendment when the officer, " 'by means of physical force or show of authority,' " terminates or restrains his freedom of movement, Florida v. Bostick, 501 U.S. 429, 434 (1991) (quoting Terry v. Ohio, 392 U.S. 1, 19 n.16 (1968)), "through means intentionally applied," Brower v. County of Inyo, 489 U.S. 593, 597 (1989) (emphasis in original). Thus, an "unintended person . . . [may be] the object of the detention," so long as the detention is "willful" and not merely the consequence of "an unknowing act." Id. at 596.

Id. at 254. The Court then addressed the State of California's assertion that Brendlin was not seized and, therefore, could not claim the evidence was tainted by an unconstitutional stop:

> We think that in these circumstances any reasonable passenger would have understood the police officers to be exercising control to the

point that no one in the car was free to depart without police permission.

A traffic stop necessarily curtails the travel a passenger has chosen just as much as it halts the driver . . . and the police activity that normally amounts to intrusion on "privacy and personal security" does not normally (and did not here) distinguish between passenger and driver. An officer who orders one particular car to pull over acts with an implicit claim of right based on fault of some sort, and a sensible person would not expect a police officer to allow people to come and go freely from the physical focal point of an investigation into faulty behavior or wrongdoing. If the likely wrongdoing is not the driving, the passenger will reasonably feel subject to suspicion owing to close association; but even when the wrongdoing is only bad driving, the passenger will expect to be subject to some scrutiny, and his attempt to leave the scene would be so obviously likely to prompt an objection from the officer that no passenger would feel free to leave in the first place.

It is also reasonable for passengers to expect that a police officer at the scene of a crime, arrest, or investigation will not let people move around in ways that could jeopardize his safety. In Maryland v. Wilson, [] we held that during a lawful traffic stop an officer may order a passenger out of the car as a precautionary measure, without reasonable suspicion that the passenger poses a safety risk. In fashioning this rule, we invoked our earlier statement that " '[t]he risk of harm to both the police and the occupants is minimized if the officers routinely exercise unquestioned command of the situation.' " Wilson, [519 U.S.] at 414 (quoting Michigan v. Summers, 452 U.S. 692, 702-703 (1981)). What we have said in these opinions probably reflects a societal expectation of " 'unquestioned [police] command' " at odds with any notion that a passenger would feel free to leave, or to terminate the personal encounter any other way, without advance permission.

Id. at 257-58 (some citations and footnote omitted). Based upon this analysis, the

Supreme Court held that Brendlin was seized from the moment the vehicle stopped

on the side of the road, and it was error for the trial court to conclude that seizure

did not occur until the formal arrest.  Id. at 263.[5]

In Johnson—another unanimous Supreme Court decision—members of a

gang task force stopped a vehicle when a license plate check revealed the

registration had been suspended.  555 U.S. at 327.  An officer noticed one of the

two passengers, Johnson, wore colors consistent with gang membership and was in

possession of a police scanner.  Id. at 328.  In response to the officer's questions,

Johnson provided his name and date of birth, and he volunteered the city he was

from—which the officer knew was home to a Crips gang.  Id.  Johnson also

admitted he had previously been incarcerated for burglary.  Id.  The officer asked

Johnson to exit the vehicle so she could distance him from the other passenger and

obtain "intelligence" about the gang of which Johnson might be a member.  Id.

_____

5. The Supreme Court rejected the State of California's contention that, under this holding, "all taxi cab and bus passengers would be 'seized' under the Fourth Amendment when the cab or bus driver is pulled over by the police for running a red light."  551 U.S. at 262 n.6.  The Supreme Court explained:

> [T]he relationship between driver and passenger is not the same in a common carrier as it is in a private vehicle, and the expectations of police officers and passengers differ accordingly.  In those cases, as here, the crucial question would be whether a reasonable person in the passenger's position would feel free to take steps to terminate the encounter.

Id.

- 15 -

Based upon her observations and Johnson's answers to her questions while he was still seated in the vehicle, the officer suspected he might possess a weapon, so when Johnson exited, she frisked him and felt the butt of a gun. Id.

After being charged with possession of a weapon by a prohibited possessor, Johnson moved to suppress the evidence as the fruit of an unlawful search. Id. at 329. In concluding the trial court properly denied suppression, the Supreme Court expressed that most traffic stops "resemble, in duration and atmosphere, the kind of brief detention authorized in Terry." Id. at 330 (quoting Berkemer v. McCarty, 468 U.S. 420, 439 n.29 (1984)). The Court explained that:

> Terry established the legitimacy of an investigatory stop "in situations where [the police] may lack probable cause for an arrest." [392 U.S. at 24]. When the stop is justified by suspicion (reasonably grounded, but short of probable cause) that criminal activity is afoot . . . the police officer must be positioned to act instantly on reasonable suspicion that the persons temporarily detained are armed and dangerous. Ibid. Recognizing that a limited search of outer clothing for weapons serves to protect both the officer and the public, the Court held the patdown reasonable under the Fourth Amendment.

Id. at 330. The Supreme Court held:

> [I]n a traffic-stop setting, the first Terry condition—a lawful investigatory stop—is met whenever it is lawful for police to detain an automobile and its occupants pending inquiry into a vehicular violation. The police need not have, in addition, cause to believe any occupant of the vehicle is involved in criminal activity. To justify a patdown of the driver or a passenger during a traffic stop, however, just as in the case of a pedestrian reasonably suspected of criminal activity, the police must harbor reasonable suspicion that the person subjected to the frisk is armed and dangerous.

- 16 -

Id. at 327. In reaching this conclusion, the Court reiterated that "traffic stops are 'especially fraught with danger to police officers,' " but the risk of harm to both the police and the vehicle occupants is minimized if " 'the officers routinely exercise unquestioned command of the situation.' " Id. at 330 (quoting Michigan v. Long, 463 U.S. 1032, 1047 (1983); Maryland v. Wilson, 519 U.S. at 414). The Supreme Court then traced its precedent—first Mimms, then Maryland v. Wilson, then Brendlin—to conclude that a vehicle driver or any passenger may be subjected to a patdown when there is reasonable suspicion to believe he is armed and dangerous. Id. at 331-32.

The Supreme Court disagreed with the conclusion of the Arizona Court of Appeals that, although Johnson was lawfully detained incident to the legitimate traffic stop, once the officer began to question him on matters unrelated to the stop, the authority to conduct a frisk ceased in the absence of reasonable suspicion that Johnson was engaged in, or about to engage in, criminal activity. Id. at 332. The Supreme Court explained:

> A lawful roadside stop begins when a vehicle is pulled over for investigation of a traffic violation. The temporary seizure of driver and passengers ordinarily continues, and remains reasonable, for the duration of the stop. Normally, the stop ends when the police have no further need to control the scene, and inform the driver and passengers they are free to leave. See Brendlin, 551 U.S. at 258. An officer's inquiries into matters unrelated to the justification for the traffic stop, this Court has made plain, do not convert the encounter into something other than a lawful seizure, so long as those inquiries do not measurably extend the duration of the stop.

> In sum, as stated in <u>Brendlin</u>, a traffic stop of a car communicates to a reasonable passenger that he or she is not free to terminate the encounter with the police and move about at will. Nothing occurred in this case that would have conveyed to Johnson that, prior to the frisk, the traffic stop had ended or that he was otherwise free "to depart without police permission." Officer Trevizo surely was not constitutionally required to give Johnson an opportunity to depart the scene after he exited the vehicle without first ensuring that, in so doing, she was not permitting a dangerous person to get behind her.

<u>Id.</u> at 333-34 (some citations omitted).

Lastly, in <u>Rodriguez</u>, the Supreme Court articulated a limitation on traffic-stop detentions. There, a K-9 officer observed a vehicle veer onto the shoulder of a road and then jerk back onto the road. 135 S. Ct. at 1612. After running a records check on the driver, Rodriguez, the officer requested the license of the passenger. <u>Id.</u> at 1613. The officer returned to his vehicle a second time to run a records check on the passenger and, at that time, he requested a second officer. <u>Id.</u> The officer issued a written warning to Rodriguez and returned to both men their documents. <u>Id.</u> The officer admitted that he had "got all the reason[s] for the stop out of the way." <u>Id.</u> Nonetheless, the officer required the men to wait until the second officer arrived. <u>Id.</u> At that time, the officer who pulled the men over led his dog around the vehicle, and the dog alerted to the presence of drugs. <u>Id.</u> A search of the vehicle revealed methamphetamine. <u>Id.</u>

After being indicted in federal court, Rodriguez moved to suppress the evidence on the ground that the officer who initiated the stop prolonged it without

- 18 -

reasonable suspicion in order to conduct the dog sniff.  Id.  The Supreme Court

agreed, explaining:

> Like a Terry stop, the tolerable duration of police inquiries in the traffic-stop context is determined by the seizure's "mission"—to address the traffic violation that warranted the stop and attend to related safety concerns.  Because addressing the infraction is the purpose of the stop, it may "last no longer than is necessary to effectuate th[at] purpose."  Authority for the seizure thus ends when tasks tied to the traffic infraction are—or reasonably should have been—completed.

Id. at 1614 (citations omitted).[6]  Consistent with Johnson, the Supreme Court

stated:

> The seizure remains lawful only "so long as [unrelated] inquiries do not measurably extend the duration of the stop."  An officer, in other words, may conduct certain unrelated checks during an otherwise lawful traffic stop.  But . . . he may not do so in a way that prolongs the stop, absent the reasonable suspicion ordinarily demanded to justify detaining an individual.

---

6.  The Supreme Court has further explained:

> Obviously, if an investigative stop continues indefinitely, at some point it can no longer be justified as an investigative stop.  But our cases impose no rigid time limitation on Terry stops.  While it is clear that the brevity of the invasion of the individual's Fourth Amendment interests is an important factor in determining whether the seizure is so minimally intrusive as to be justifiable on reasonable suspicion, we have emphasized the need to consider the law enforcement purposes to be served by the stop as well as the time reasonably needed to effectuate those purposes.

United States v. Sharpe, 470 U.S. 675, 685 (1985) (citation and quotation marks omitted).

Id. at 1615 (citations omitted).  According to the Supreme Court, the officer's

mission includes ordinary inquiries incident to the traffic stop—such as checking

the driver license, checking for outstanding warrants against the driver, and

inspecting the vehicle's registration and proof of insurance, all of which serve the

same goal as enforcing the traffic code: "ensuring that vehicles on the road are

operated safely and responsibly."  Id.

The Supreme Court then distinguished the dog sniff as a measure directed at

detecting evidence of criminal wrongdoing—something which is not an ordinary

incident of a traffic stop, or part of the officer's traffic mission.  Id.  The Supreme

Court elaborated:

> Unlike a general interest in criminal enforcement, however, the
> government's officer safety interest stems from the mission of the stop
> itself.  Traffic stops are "especially fraught with danger to police
> officers," Johnson, 555 U.S. at 330 (internal quotation marks omitted),
> so an officer may need to take certain negligibly burdensome
> precautions in order to complete his mission safely.  On-scene
> investigation into other crimes, however, detours from that mission.
> So too do safety precautions taken in order to facilitate such detours.
> Thus, even assuming that the imposition here was no more intrusive
> than the exit order in Mimms, the dog sniff could not be justified on
> the same basis.  Highway and officer safety are interests different in
> kind from the Government's endeavor to detect crime in general or
> drug trafficking in particular.

Id. at 1616 (citations omitted).

**Analysis**

The evolution of these cases—primarily the statements in <u>Brendlin</u>, 551 U.S. at 258, that "[i]t is . . . reasonable for passengers to expect that a police officer at the scene of a crime, arrest, or investigation will not let people move around in ways that could jeopardize his safety," and in <u>Johnson</u>, 555 U.S. at 333, that "[t]he temporary seizure of driver and passengers ordinarily continues, <u>and remains reasonable</u>, for the duration of the stop" (emphasis added)—demonstrates that the <u>Presley</u> and <u>Aguiar</u> courts correctly held that law enforcement officers may prevent passengers from leaving a traffic stop, as a matter of course, without violating the Fourth Amendment. In <u>Johnson</u>, the Supreme Court reiterated that the "weighty interest in officer safety" applies regardless of whether the occupant of the vehicle is a driver or a passenger, and the motivation of a passenger to employ violence to prevent apprehension for a more serious crime "is every bit as great as that of the driver." 555 U.S. at 331-32 (quoting <u>Maryland v. Wilson</u>, 519 U.S. at 413-14). The Supreme Court also explained that because the passenger is already stopped, the "additional intrusion on the passenger is minimal." <u>Id.</u> at 332 (quoting <u>Maryland v. Wilson</u>, 519 U.S. at 415).

As previously discussed, both the First and Fifth Districts concluded that, even if asking a passenger to remain at the scene is more burdensome than merely asking the passenger to exit the vehicle, the intrusion upon personal liberty is <u>de</u>

- 21 -

minimis because (1) the method of transport has already been lawfully interrupted by virtue of the stop, (2) the passenger has already been stopped by virtue of the driver's lawful detention, and (3) routine traffic stops are brief in duration. Presley, 204 So. 3d at 88 (quoting Aguiar, 199 So. 3d at 926). This conclusion is consistent with the evolution of Supreme Court precedent and the common thread that runs through these cases—the "legitimate and weighty interest" in officer safety during a traffic stop outweighs the intrusion upon a passenger's liberty interest and permits an officer to exercise "unquestioned command of the situation." Johnson, 555 U.S. at 330-31 (quoting Mimms, 434 U.S. at 110; Maryland v. Wilson, 519 U.S. at 414).

As reflected by Rodriguez, however, the length of detention during a traffic stop is not subject to the unfettered discretion of law enforcement. Instead, "[b]ecause addressing the infraction is the purpose of the stop, it may last no longer than is necessary to effectuate th[at] purpose," and the "[a]uthority for the seizure . . . ends when tasks tied to the traffic infraction are—or reasonably should have been—completed." Rodriguez, 135 S. Ct. at 1614 (internal citations and quotation marks omitted). Therefore, law enforcement officers may detain passengers only for the reasonable duration of a traffic stop. See id. (citing United States v. Sharpe, 470 U.S. 675, 686 (1985), for the proposition that "in determining the reasonable duration of a stop, 'it [is] appropriate to examine whether the police diligently

- 22 -

pursued [the] investigation' "). During a routine traffic stop, this is the length of time necessary for law enforcement to check the driver license, the vehicle registration, and the proof of insurance; to determine whether there are outstanding warrants; to write any citation or warning; to return the documents; and to issue the warning or citation. At that time, and in the absence of reasonable suspicion that a passenger is engaged in criminal activity, "the police have no further need to control the scene," Johnson, 555 U.S. at 333, and the passenger must be allowed to depart. Detention is permissible for this limited period of time because it allows law enforcement officers to safely do their job—accomplishing the "mission" of the stop—and not be at risk due to potential violence from passengers or other vehicles on the roadway.

## The Present Case

Despite our previous explanation as to what constitutes a reasonable period of time to detain passengers during a routine traffic stop, the facts of this case present a situation that was anything but routine. Instead, a stop that was initiated for basic traffic violations[7] quickly evolved into a struggle between a law enforcement officer and a passenger who had attempted to leave, requiring that officer to call for backup. Therefore, in determining whether the detention of

---

7. Presley does not challenge the bases asserted by Officer Jallad for the initiation of the traffic stop.

Presley was constitutional, we must evaluate under the specific facts of this case whether the duration of the traffic stop was reasonable, such that the "mission" of the stop—"to address the traffic violation that warranted the stop and attend to related safety concerns"—could be completed. Rodriguez, 135 S. Ct. at 1614 (citations omitted).

Here, the traffic stop commenced when Officer Jallad pulled the vehicle over for a faulty taillight and a stop sign violation. It is not clear from the record how much time elapsed between the stop and the arrival of Officers Pandak and Meurer in response to the request for assistance. However, the circuit court found that from the time Officers Pandak and Meurer arrived, to the time they were notified that Presley was on probation, thereby providing probable cause for Presley's arrest, "only a matter of minutes had passed." This conclusion is supported by competent, substantial evidence. See Twilegar, 42 So. 3d at 192. Further, although this traffic stop may have lasted longer than a routine, uneventful stop, it was prolonged not by law enforcement, but by the fact that one of the passengers exited the vehicle and attempted to leave. Therefore, instead of being able to address the traffic violations immediately, Officer Jallad first needed to secure that passenger, who was belligerent and had to be placed in handcuffs. For Officer Jallad to "complete his mission safely," Rodriguez, 135 S. Ct. at 1616, we conclude the detention was reasonably extended in order for backup officers to

- 24 -

arrive and assist with the driver and Presley. Nothing in the record suggests that the duration of this traffic stop was unreasonable and, accordingly, we hold that the seizure of Presley did not violate the Fourth Amendment.

**CONCLUSION**

Based upon the foregoing, we approve both the decision below and Aguiar. We hold that, as a matter of course, law enforcement officers may detain a vehicle's passengers for the reasonable duration of a traffic stop without violating the Fourth Amendment. We disapprove of the Fourth District's decision in Wilson v. State, and any cases that rely upon Wilson v. State for the proposition that law enforcement officers under the Fourth Amendment are precluded from detaining passengers for the reasonable duration of a traffic stop.

It is so ordered.

PARIENTE, LEWIS, QUINCE, CANADY, POLSTON, and LAWSON, JJ., concur.
PARIENTE, J., concurs with an opinion.

NOT FINAL UNTIL TIME EXPIRES TO FILE REHEARING MOTION, AND IF FILED, DETERMINED.

PARIENTE, J., concurring.

This Court is bound by the precedent of the United States Supreme Court when interpreting the Fourth Amendment to the United States Constitution. See art. I, § 12, Fla. Const. Consistent with that precedent, the majority is correct that "as a matter of course, law enforcement officers may detain a vehicle's passengers

- 25 -

for the reasonable duration of a traffic stop without violating the Fourth Amendment." Majority op. at 25. In this case, the defendant does not challenge the reasonableness of the duration of the traffic stop, and I agree with the majority that "under the specific facts of this case," the stop was reasonable when "it was prolonged not by law enforcement, but by the fact that one of the passengers" was belligerent and had to be secured. Majority op. at 24.

I also fully appreciate that officer safety is a reason the United States Supreme Court has concluded "that the Fourth Amendment permits law enforcement officers to order passengers out of a vehicle." Majority op. at 11. However, when the traffic stop does not give rise to a need to question passengers or ask for their identification, I fail to comprehend why the interrogation of passengers on matters unrelated to the traffic stop, "so long as those inquiries do not measurably extend the duration of the stop," does not intrude on the constitutional guarantee to be free from unreasonable searches and seizures. Arizona v. Johnson, 555 U.S. 323, 333 (2009).

In this case, similar to the conflict case, Aguiar v. State, 199 So. 3d 920 (Fla. 5th DCA 2016), the traffic stop was for a faulty taillight and running a stop sign. See id. at 922 (explaining that the defendant "was the front-seat passenger in a vehicle being stopped because a brake light was out and the driver was not wearing a seat belt"). Presley, who is black, was a passenger in a car driven in the early

- 26 -

morning hours in a neighborhood in Gainesville, Florida, that one of the responding police officers described as a "high-crime, high-drug area." One of the other passengers in the car lived in a house in the neighborhood. The stop was certainly justifiable based on the traffic violations, but there was no reasonable suspicion to otherwise justify the continued interrogation. Yet, the officer attempted to justify the detention of the passengers of the stopped car based on the following:

> [T]he totality of circumstances . . . late at night, one person already left the—left the car, which was suspicious in and of itself, high-crime, high-drug area, numerous other people walking around, officer safety . . . for me to feel comfortable with this person leaving a potential crime scene and getting away with something, and/or destroying evidence, or coming back to harm me and my fellow officers. So yes, he was not free to leave.

Because under the Fourth Amendment it does not matter whether the traffic stop was pretextual, see Whren v. United States, 517 U.S. 806, 813 (1996), I fear that Johnson and other recent Fourth Amendment decisions of the United States Supreme Court, which condone the detention and questioning of passengers for reasons entirely unrelated to the traffic stop so long as the questioning occurs under the auspices of a "reasonably" long traffic stop, will lead to the erosion of the guarantees afforded by the Fourth Amendment to those citizens who visit and live in neighborhoods some may describe as "high-crime," or otherwise suspicious. See majority op. at 10-18 (discussing Johnson, Maryland v. Wilson, 519 U.S. 408

- 27 -

(1997), and <u>Brendlin v. California</u>, 551 U.S. 249 (2007)).  Indeed, as this case and

<u>Aguiar</u> demonstrate, passengers need be wary of the risk of detention when

choosing whether to ride in a car with a faulty taillight.

As Justice Sotomayor has eloquently explained, it is a real concern that these

expanded rules regarding lawful seizures will adversely impact minorities:

> This Court has given officers an array of instruments to probe and examine you.  When we condone officers' use of these devices without adequate cause, we give them reason to target pedestrians in an arbitrary manner.  We also risk treating members of our communities as second-class citizens.
>
>       . . . .
> As the Justice Department notes, . . . many innocent people are subjected to the humiliations of these unconstitutional searches.  The white defendant in this case shows that anyone's dignity can be violated in this manner.  <u>See</u> M. Gottschalk, <u>Caught</u> 119-138 (2015).  But it is no secret that people of color are disproportionate victims of this type of scrutiny.  <u>See</u> M. Alexander, <u>The New Jim Crow</u> 95-136 (2010).  For generations, black and brown parents have given their children "the talk"—instructing them never to run down the street; always keep your hands where they can be seen; do not even think of talking back to a stranger—all out of fear of how an officer with a gun will react to them.  <u>See, e.g.</u>, W.E.B. Du Bois, <u>The Souls of Black Folk</u> (1903); J. Baldwin, <u>The Fire Next Time</u> (1963); T. Coates, <u>Between the World and Me</u> (2015).
>
>       . . . .
>       We must not pretend that the countless people who are routinely targeted by police are "isolated."  They are the canaries in the coal mine whose deaths, civil and literal, warn us that no one can breathe in this atmosphere.  <u>See</u> L. Guinier & G. Torres, <u>The Miner's Canary</u> 274-283 (2002).  They are the ones who recognize that unlawful police stops corrode all our civil liberties and threaten all our lives.  Until their voices matter too, our justice system will continue to be anything but.

<u>Utah v. Strieff</u>, 136 S. Ct. 2056, 2069-71 (2016) (Sotomayor, J., dissenting) (citation omitted).

In this case, the majority announces a bright-line rule for cases involving a routine traffic stop but then explains how the facts of this case were anything but routine. <u>See</u> majority op. at 23. Regardless, I agree that "under the specific facts of this case," <u>id.</u> at 24, the length of the traffic stop was reasonable, and subsequent United States Supreme Court precedent requires that we disapprove of <u>Wilson v. State</u>, 734 So. 2d 1107 (Fla. 4th DCA 1999). Because we are bound to follow the United States Supreme Court precedent "on search and seizure issues," I concur but I would not announce a bright-line rule.

Application for Review of the Decision of the District Court of Appeal – Certified Direct Conflict of Decisions

First District - Case No. 1D15-4891

(Alachua County)

Andy Thomas, Public Defender, Laurel Cornell Niles, Steven L. Seliger, and Joel Arnold, Assistant Public Defenders, Second Judicial Circuit, Tallahassee, Florida,

for Petitioner

Pamela Jo Bondi, Attorney General, Trisha Meggs Pate, Bureau Chief, Samuel B. Steinberg, and Robert "Charlie" Lee, Assistant Attorneys General, Tallahassee, Florida,

for Respondent